Irwin MAUTNER, individually and as Trustee u/t/a dated October 25, 1984, Win–Ter Management Co., Shari and Jay Stack, individually and as Trustees u/t/a dated April 30, 1981, June 28, 1983 and January 30, 1985, Jonathan N. Tanner, and Tanner & Gilbert P.C. Retirement Plan Trust, all of the foregoing individually and on behalf of the shareholders of Transportation Capital Corp., Plaintiffs,

v.

Melvin L. HIRSCH, Dorothy T. Hirsch, and Jonathan H. Hirsch and Transportation Capital Corp., Defendants.

No. 91 Civ. 4928 (WCC).

United States District Court,
S.D. New York.

Sept. 7, 1993.

Lester J. Tanner, John R. Fernbach, Eisenberg Honig Fogler Dimas & Johnson by Steven C. Bagwin, New York City, for plaintiffs.

Butler, Fitzgerald & Potter, P.C. by Stuart Potter, New York City (Stuart Potter and Mihal Nahari, of counsel), for defendant Transp. Capital Corp.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

Irwin Mautner ("Mautner") and several individuals and entities associated with Lester J. Tanner ("Original Plaintiffs") brought this shareholder derivative action to recover for Transportation Capital Corp. ("TCC") and, where applicable, for the shareholders of TCC, damages due to injuries caused by the alleged fraudulent actions, breach of fiduciary duties and waste of defendants Melvin L. Hirsch, Dorothy T. Hirsch and Jonathan H. Hirsch (the "Hirsch defendants") in managing, operating and directing the management of TCC.[1] The Original Plaintiffs alleged claims under Sections 10(b) and 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78m(d), under the Investment Company Act of 1940, 15 U.S.C. § 80a-1 et seq., under the Small Business Investment Act of 1958, 15 U.S.C. § 661 et seq., under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and under New York Business Corporation Law of 1961 ("BCL") Sections 626 and 706.

This action is currently before the Court on the application of Lester J. Tanner, John R. Fernbach, and Eisenberg Honig Fogler Dimas & Johnson ("Eisenberg") for an order and judgment directing TCC to pay them legal fees and disbursements in the aggregate amount of $667,382. Applicants also seek an additional award of $87,907 for time devoted to this application, as well as prejudgment interest on the award of legal fees.

## BACKGROUND

The factual record relating to the instant application as established in pleadings, affidavits, documents, depositions and testimony given before this Court is far too elaborate to

---

1. On February 28, 1992, the Hirsches sold all their shares of TCC common stock, and Original Plaintiffs sold their remaining shares of TCC common stock, to LNC Investments, Inc. ("LNC"), a subsidiary of Leucadia National Corp. ("Leucadia") and a major stockholder of TCC. As of the same day, the parties entered into a stipulation confirming that, as provided by a previous stipulation, (i) Original Plaintiffs were deemed to have withdrawn as parties plaintiffs, (ii) LNC was to be substituted as a party plaintiff, asserting all derivative claims, and (iii) the direct claims in the Complaint were dismissed with prejudice and without costs.

recount here. The Court thus presumes familiarity with the facts presented in previous Opinions relating to this matter, and recites here only the essential facts relevant to this application.

TCC was formed in 1979 for the purpose of operating as a Minority Enterprise Small Business Investment Company and is licensed under the Small Business Investment Act of 1958. TCC is regulated and financed in part by the United States Small Business Administration ("SBA").

The events leading to the commencement of suit by Original Plaintiffs were initially triggered by an audit report and subsequent letter of January 3, 1991, issued by the SBA, charging TCC with serious violations of SBA regulations. The violations included findings of excessive compensation and impermissible legal fees paid to Melvin Hirsch and members of his family. At the time of the SBA letter, Melvin Hirsch was Chief Executive Officer, President and a director of TCC. His wife Dorothy Hirsch was Chief Financial Officer, Secretary, Treasurer and a director of TCC. Their son Jonathan Hirsch was Vice–President and a director of TCC. The SBA letter suggested that the violations might be remedied by direct reimbursement or by a reduction in TCC's private capital.[2]

In response to the SBA letter, Irwin Mautner, a director and stockholder of TCC, and Lester Tanner, corporate counsel to TCC, attempted various actions within the corporate structure to address the problems highlighted by the SBA. These efforts, for the most part, were unsuccessful. Rather than reimbursing the excess compensation, Melvin Hirsch unilaterally opted to reduce private capital as suggested by the SBA; TCC's Board of Directors could not muster the majority needed to overturn this position, despite the persistence of Tanner and Mautner in arguing for return of the excess payments.[3] While a three-member audit committee was appointed by the Board,[4] the committee was apparently denied access to records sought in relation to the Melvin L. Hirsch Special Account (the "Special Account").[5] On June 18, 1991, five of the eight directors voted to adjourn summarily the Board meeting scheduled to receive the audit committee's report;[6] at the following meeting on June 26, four directors voted to add all the directors as members of the audit committee,[7] thereby eliminating, according to applicants, the "majority of independent directors" on the audit committee. *See* Ex. GGG; App. Post–Hearing Reply Memo. at 6.

Applicants claim that, as result of these obstacles, by June 20, 1991, plaintiffs became convinced that only independent action could achieve the relief desired for TCC and maintain that it was on that date that independent counsel was engaged for this purpose. App. Post–Hearing Memo. at 3. On June 20, Tanner invited each TCC director to attend a meeting arranged with the SEC in Washing-

2. During the hearing on the present application, it was admitted that the option given to the Hirsches to reduce private capital as a suitable alternative to returning excess compensation was "simply a mistake on SBA's part," atypical of the treatment given to excessive compensation in other similar instances. Tr. 11/9 at 148–51.

3. Despite the "dissent" of Paul Thorner, a brother of Dorothy Hirsch and a director of TCC, from Mr. Hirsch's decision to reduce private capital, the position of the three Hirsches and apparently of Lawrence Glaubinger, a TCC director selected by LNC, made it impossible for the eight-member board to muster the opposition needed to overcome the Hirsches' stance on this matter. *See* Ex. G and App. Post–Hearing Reply Memo. at 5.

4. The audit committee consisted of Mautner, Glaubinger and Flateman, another TCC director. Tanner served as counsel to the committee.

5. TCC insists that there is nothing in the record to establish that any TCC director, other than

Melvin Hirsch, interfered with Tanner or Mautner's efforts to obtain access to the Special Account. TCC Post–Hearing Memo. at 4–5. Notably, however, TCC can point to nothing in the record to counter Tanner's charge that Melvin Hirsch was able to deny the audit committee such access despite repeated requests before June 20, 1991, nor point to any decisive steps taken by the Board to facilitate procuring the records desired.

6. Mautner, Asher and Flateman voted against the adjournment and, on the following day, called a special meeting of the Board for June 26, 1991. *See* Ex. X.

7. Jonathan Hirsch, Dorothy Hirsch, Glaubinger and Thorner voted in favor of this motion, while Mautner, Flateman and Asher voted against it. Ex. GGG.

ton, D.C. for June 24, 1991, to discuss, among other things, TCC's financial statements and the directors' obligation of disclosure. On that same day, Melvin Hirsch dismissed Tanner as corporate counsel to TCC and counsel to its audit committee[8] and, on June 24, 1991, replaced Tanner's firm with Butler, Fitzgerald & Potter ("BFP"). Tr. 11/10/92 at 29.

On June 26, 1991, Melvin and Dorothy Hirsch resigned as officers of TCC, but remained as directors and shareholders. On July 17, 1991, TCC's Board elected two additional directors, James Jordan and Paul Borden, both representatives of Leucadia, to fill vacancies created in February of that year.[9] On July 19, 1991, Original Plaintiffs commenced this action, seeking to recover, on behalf of TCC, funds improperly appropriated by the Hirsches, to remove the Hirsches as directors and Jonathan Hirsch as an officer of TCC, and to invalidate the election of Borden and Jordan. The derivative claims alleged, *inter alia*, that the Hirsches were liable to TCC because they allegedly received excessive compensation and unauthorized payments from TCC, and caused TCC to make wrongful payments to third parties and to incur losses due to improper loans.

On July 19, 1991, Original Plaintiffs moved for a preliminary injunction enjoining the Hirsch defendants, Borden and Jordan from acting as directors of TCC, and also enjoining Jonathan Hirsch from acting as an officer of TCC, until trial on the merits. After a two-day hearing held September 3 and 4, 1991, the Court denied Original Plaintiffs' motion for a preliminary injunction in an Opinion and Order dated November 15, 1991.

On October 4, 1991, plaintiff Tanner & Gilbert P.C. Retirement Plan Trust ("Tanner Firm Trust") moved for a partial summary judgment. In an Opinion and Order dated November 22, 1991, the Court denied Tanner Firm Trust's motion for partial summary judgment with one exception: the Court determined that Melvin Hirsch must pay pre-judgment interest at 9% per-annum on his borrowings from the Special Account.

On or about October 10, 1991, TCC and the Hirsches entered into a written settlement agreement (the "Superseded Settlement Agreement") in which they compromised the derivative claims against the Hirsches. Pursuant to the Superseded Settlement Agreement, the Hirsches agreed to deliver to TCC 333,333 shares of TCC common stock in full settlement of all derivative claims. The Hirsches also agreed to give limited releases to TCC. In addition, it was agreed that Jonathan Hirsch would enter into an employment contract pursuant to which he would be employed as a Senior Loan Officer and Vice–President of TCC through October 10, 1992.

On November 18, 1991, the Court held an evidentiary hearing on the advisability of approving the Superseded Settlement Agreement. Original Plaintiffs opposed approval at the hearing. On the following day, Original Plaintiffs, TCC and the Hirsches discussed a possible resolution of the entire action and the hearing was suspended to permit the parties to continue negotiations.

On or about February 24, 1992, prior to the resumption of the hearing, TCC and the Hirsches entered into a modified Settlement Agreement (the "Settlement Agreement"), which differed from the Superseded Settlement Agreement only to the extent that, instead of receiving 333,333 shares of common stock, TCC received $676,666 in cash, plus an amount equal to one-third of any legal fees, up to a maximum of $66,000, awarded to Original Plaintiffs.

On March 16, 1992, TCC and the Hirsches allocated the $676,666 to be paid in settlement as follows: (i) $95,000 to the claim for interest due and owing on Melvin Hirsch's borrowings from the Special Account; (ii) $112,500 to the claim for recovery of TCC's contribution to the Harvard Law School, including interest; (iii) $130,000 to the claims against the Hirsches for loan losses suffered

---

**8.** While Tanner appears to have disputed the validity of the discharge, it was ratified by a four-to-two vote of the Board on June 26, and then ratified again at a July 17, 1991 Board meeting. *See* Ex. GGG, KKK.

**9.** The election carried by a close vote, with Mautner voting against and Asher and Flateman abstaining.

by TCC and interest thereon; (iv) $339,166 to the balance of such claims, including claims for excessive compensation and legal fees. In an Opinion and Order dated May 1, 1992, the Court approved the proposed settlement as fair, reasonable and adequate.

Subsequently, the parties briefed the attorneys' fees issue, the stockholders of the corporation were given notice of the fee applications of plaintiffs' attorneys and the Court ultimately held a six-day hearing on the application of Tanner, Fernbach and Eisenberg for an order and judgment directing TCC to pay legal fees and disbursements.

## DISCUSSION

The determination of proper legal fees involves a two-step process. First, the Court begins with a "lodestar" figure computed by multiplying the number of hours expended by the normal hourly rate charged. *City of Detroit v. Grinnell*, 495 F.2d 448, 468–74 (2d Cir.1974); *Schwartz v. Novo Industri A/S*, 119 F.R.D. 359, 364 (S.D.N.Y.1988); *Weissman v. Alliance Capital Management Corp.*, 650 F.Supp. 101, 103 (S.D.N.Y.1986). Second, the Court may exercise its discretion to adjust the lodestar figure "on the basis of frankly subjective factors." *In re "Agent Orange" Prod. Liab. Lit.*, 611 F.Supp. 1296, 1310 (E.D.N.Y.1985), *modified on other grounds,* 818 F.2d 216 (2d Cir.1987).

In *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Supreme Court, in discussing the procedure for fixing legal fees to be awarded the prevailing plaintiff in a civil rights litigation under 42 U.S.C. § 1988, emphasized that the lodestar figure is merely the starting point of analysis, and that the "crucial factor" is the extent of the plaintiff's success. Thus the lodestar figure may be increased in appropriate circumstances, *see Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 371, 86 S.Ct. 845, 850, 15 L.Ed.2d 807 (1966), and may be reduced or even disallowed altogether. *See, e.g., New York State Assoc. for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1146 (2d Cir.1983); *Brown v. Stackler*, 612 F.2d 1057 (7th Cir. 1980); *Barnett v. Pritzker*, 73 F.R.D. 430, 433 (S.D.N.Y.1977).

Applicants present the following lodestar figures for which they request a fee award:

| | |
|---|---|
| Tanner: | $431,440 |
| Fernbach: | $130,500 |
| Eisenberg: | $ 49,992 |
| Total: | $611,932 |

Applicants also request recovery of their disbursements from the action-in-chief, and an award of fees for time devoted to this application, in the following amounts:

| | Disbursements Action-in-Chief | Fee Application |
|---|---|---|
| Tanner: | $54,574 | $45,750 |
| Fernbach: | $ 792 | $29,575 |
| Eisenberg: | $ 84 | $12,582 |
| Total: | $55,450 | $87,907 |

TCC presents various theories as to why applicants should not prevail in their application for legal fees. TCC contends that applicants are entitled to either no compensation, or diminished compensation because, in broad terms: (1) they failed to make demand on the Board of Directors to commence the action and such a demand would not have been futile; (2) applicants were not the competent producing cause of the monetary benefits, both liquidated and unliquidated, or the non-monetary benefits accruing to TCC; (3) applicants are not entitled to payments for efforts on the injunctive claims because they were undertaken for purely personal gain and did not produce a benefit for TCC; (4) applicants engaged in misconduct and had a conflict of interest in their roles as attorneys and class representatives; (5) any fees to which applicants may otherwise be entitled must be reduced due to inefficient prosecution and serious deficiencies in the maintenance of time records. TCC also opposes any award of pre-judgment interest, should the Court grant applicants request for fees, as well as any award of fees for time devoted to this application. The Court will discuss these contentions seriatim.

### I. *Failure to Make Demand*

TCC notes that the procedural requirements of federal law and the substantive requirements of New York law require a plaintiff either to plead that a demand has been made on the corporation's board of directors to commence an action, or to plead facts showing that such a demand would be futile, citing Fed.R.Civ.P. 23.1; *RCM Sec.*

**1064**

*Fund, Inc. v. Stanton,* 928 F.2d 1318 (2d Cir.1991); *Lewis v. Graves,* 701 F.2d 245, 248 (2d Cir.1983); *Stoner v. Walsh,* 772 F.Supp. 790, 795 (S.D.N.Y.1991); *Barr v. Wackman,* 36 N.Y.2d 371, 368 N.Y.S.2d 497, 329 N.E.2d 180 (1975). *See also, Kamen v. Kemper Financial Services, Inc.,* 500 U.S. 90, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991). The requirement that a derivative plaintiff plead demand or futility reflects a policy intended to encourage intra-corporate remedies to:

> [G]ive a derivative corporation itself the opportunity to take over a suit which was brought on its behalf in the first place, and thus to allow the directors the chance to occupy their normal status as conductors of the corporation's affairs.

*Lewis v. Graves,* 701 F.2d 245, 247 (2d Cir. 1983) (quoting *Brody v. Chemical Bank,* 517 F.2d 932, 934 (2d Cir.1975)). TCC submits that this same policy should permit the Court to deny the award of legal fees if, irrespective of whether plaintiffs have met their pleading burden, the derivative corporation shows that demand has not been made and would not have been futile. TCC grants that applicants adequately satisfied their pleading requirement by setting forth with particularity in the complaint the evidentiary facts indicating that a demand on TCC's Board to commence action on the derivative claims would have been futile.[10] However, TCC now seeks to show that such a demand would not have been hopeless and, accordingly, urges the Court to disallow counsel fees due to applicants failure to make such demand. TCC refers to the "investigation" pursued by some of TCC's officers and counsel after Original Plaintiffs instituted this action, to the fact that the relationship between the three Hirsches and the other five Board members had become "strained" by the date the action was commenced, and to TCC's role in negotiating settlement with the Hirsches, to convince the Court that a proper demand upon the corporation would not have been futile.

Despite the factors pointed to by TCC, we do not find sufficient grounds to sustain a ruling that counsel fees should be withheld

on this basis. First, the findings necessary to support such a conclusion are far too speculative to form the foundation of a decision to disallow counsel fees after the advantages of applicants' endeavors have enured to the benefit of the corporation. Second, such a conclusion flies in the face of facts familiar to the Court. TCC had ample opportunity to pursue claims against the Hirsch defendants prior to the commencement of this suit, or within the context of this action, once it was instituted by Original Plaintiffs. TCC failed to support original plaintiffs' action; the resistance of TCC's Board and the tactics of its counsel BFP reveal a tendency to protecting the Hirsch defendants from the consequences of plaintiffs' lawsuit. Thus the Court can hardly conclude now that applicants' fees should be disallowed in their entirety because TCC would have promptly brought this action, if and when a proper demand had been made upon the corporation.

## II. Causation of Benefits Accruing to TCC

Applicants submit that their request for legal fees and disbursements are more than justified by the substantial monetary and non-monetary benefits bestowed upon TCC as a consequence of Original Plaintiffs' action. Conversely, TCC argues that applicants are not entitled to fees because their efforts were not a competent producing cause of the benefits claimed to have been conferred upon the corporation.

■ Essential to an award of fees in a shareholder derivative action is a showing that "the attorney's services were a competent producing cause of the supposed benefit conferred." *Lewis v. Anderson,* 81 F.R.D. 436, 442 (S.D.N.Y.1978) (citing *Wechsler v. Southeastern Properties, Inc.,* 506 F.2d 631, 635 (2d Cir.1974)). The burden of proof lies with the attorney to demonstrate that the efforts expended were a proximate cause of the benefits achieved by the corporation in the lawsuit. This burden, however, does not typically appear to be a heavy one. *See e.g., Wechsler v. Southeastern Properties, Inc.,*

---

**10.** Indeed, TCC allows that it was for this reason that the corporation chose not to move to dismiss

for failure to meet the pleading requirement. TCC Post-Hearing Memo at 15.

506 F.2d 631, 635 (2d Cir.1974) (allowing recovery for "coattail" plaintiff following Attorney General's action); *Mokhiber v. Cohn*, 608 F.Supp. 616, 627 (S.D.N.Y.1985), *aff'd*, 783 F.2d 26 (2d Cir.1986) (causation found where plaintiff's action may have caused company's accountant to be more attentive to small details in a company audit). In fact, with regard to certain benefits, applicants suggest that the sequence of events leading to settlement of this action may, by themselves, be sufficient to demonstrate causation, relying substantially on *Koppel v. Wein*, 743 F.2d 129, 135 (2d Cir.1984) ("plaintiffs' undisputed facts as to the sequence of events almost entitle them to summary judgment on the issue of causation"). As to those claims eventually mooted by TCC's independent action, applicants maintain that the burden of persuasion rests with defendants on the issue of causation. *See Wein*, 743 F.2d at 135 (where plaintiffs' lawsuit is mooted by defendants' corrective action, burden properly shifts to defendants to establish absence of causal connection). TCC, for its part, vigorously contests each of the benefits claimed to have been occasioned by applicants' efforts.

## A. Liquidated Monetary Benefits

### 1. *Repayment of Borrowed Funds From the Special Account*

Applicants claim that TCC's recovery, on July 2, 1991, of $252,963 borrowed by Melvin Hirsch from the Special Account is a liquidated monetary benefit for which applicants are entitled to an award of counsel fees. Applicants point to the persistence of Tanner and Mautner since June 4, 1991, in pressing for an investigation of the Special Account in the face of ambivalent support from TCC's Board. Applicants stress especially the importance of their efforts after June 20, 1991, when applicants indicate independent counsel was retained and the decision was made to proceed outside the corporate governance,

and in particular, the June 24 meeting applicants scheduled with the SBA and SEC to report the "stonewalling" on the Special Account. TCC argues that applicants were not the competent producing cause of the recovery of the borrowed funds. The borrowings were repaid on July 2, 1991, seventeen days before applicants commenced this action.[11] Further, TCC points to Tanner's testimony that he was not aware of the borrowings prior to July 2, 1991, *see* Tr. 9/21 at 183, and to the fact that neither applicant John Fernbach nor applicant Steven Bagwin of Eisenberg had any awareness of the borrowings prior to that date.[12] Moreover, TCC maintains there is nothing in the record to prove that Melvin Hirsch repaid the borrowings due to applicants' efforts, or as a consequence of the June 24 meeting applicants scheduled with the SBA and SEC.

Despite the obvious difficulty in discerning the precise motivation behind Melvin Hirsch's disclosure and return of his borrowings from the Special Account, it is apparent, as applicants indicate, that this was hardly an act of spontaneous remorse or voluntary restitution, but rather a response to the persistent efforts by applicants to investigate the Hirsches, and very likely a way for Melvin Hirsch to mitigate the serious charges anticipated. It is fairly clear that prior to July 1, 1991, no other meaningful efforts were pursued by TCC with regard to the Special Account; the adjournment of the June 18 Board meeting effectively postponed the Audit Committee's report on this matter. Thus, applicants' assertion that it was their efforts since June 20, 1991—their contact with the SBA and SEC, and the independent investigation and anticipated legal action brought by Original Plaintiffs—that resulted in the disclosure and return of the borrowings seems a reasonable conclusion.

TCC notes, however, that the corporation has already paid Tanner's firm for services

---

11. To be precise, the funds appear to have initially been placed in a segregated account until certain issues raised by TCC's counsel as to the propriety of accepting the funds into the regular corporate account were resolved. *See* Tr. 11/9, at 135–36; Tr. 11/10 at 187; App. Post–Hearing Memo. at 21.

12. With respect to applicant Fernbach, TCC points to the fact that he did not visit the SBA or SEC, nor was retained by plaintiffs until July 2, 1991, and therefore cannot claim entitlement to any fee award based upon the benefit of the July 2, 1991 recovery of funds borrowed from the Special Account. *See* Fernbach Aff. 6/12/92.

rendered through June 30, 1991 and, therefore, any benefit conferred upon TCC from applicants' efforts through June 30 cannot form the basis of a fee award under the present application. Even if Original Plaintiffs had retained Tanner as independent counsel on June 20, TCC indicates that work done by Tanner towards the institution of this action overlapped substantially with the work done in his capacity as corporate counsel, so that Tanner should not be paid again for this work based on the benefits it bestowed upon TCC. Tanner, on the other hand, reminds the Court that he was discharged by Melvin Hirsch on June 20, 1991—a discharge that was confirmed by the Board on June 26 and then again on July 17—and that the February 28, 1992 agreement he signed in settlement of claims for fees for legal services performed for TCC through June 30, 1991, specifically excepted claims for fees for services rendered in connection with Original Plaintiffs' action. *See* Ex. P–6.

The February 28, 1992 agreement between Tanner Propp Fersko & Sterner ("TPFS") and TCC expressly acknowledges that "on and prior to June 30, 1991, TPFS performed legal services for TCC." Ex. P–6. The $84,776 identified in a WHEREAS clause in the agreement as TPFS's claim for services performed through June 30, 1991, appears to consist of $55,454 for the period April 1 to June 20, 1991, and $29,322 for the period June 20 through June 30, 1991. *See* Ex. BBBB. The agreement purports to settle all of TPFS's claims for legal fees, except for fees and disbursements with respect to services relating to Original Plaintiffs' action. Ex. P–6. Thus Mr. Tanner's suggestion that TPFS was not paid by TCC for services rendered after June 20, 1991 is contrary to the plain language of the agreement he signed specifically to settle the fee dispute, as well as contrary to the statement made in his affidavit that "we have been paid for the time prior to July 1, 1991." Tanner 6/12/92 Aff. ¶ 10.

Given these facts, the only remaining questions are whether Tanner also rendered services for Original Plaintiffs between June 20 and June 30, 1991 and, if so, whether applicants are entitled to compensation under this application for such services. TCC disputes applicants' assertion that Original Plaintiffs engaged independent counsel on June 20, 1991. Moreover, even if independent counsel had been retained, TCC maintains that the services performed for Original Plaintiffs were identical to the services rendered to TCC and therefore such services should not form the basis of a fee award under this application. A review of the relevant TPFS time records reveals that the services rendered to TCC—for which the February agreement purportedly settled the fees owed—were substantially similar, if not identical, to the work Tanner claims was performed on Original Plaintiffs' behalf between June 20 and June 30, 1991. *See* Ex. CCC. Thus, there is some merit to TCC's position that it should not have to pay presently for the benefit such work conferred upon the corporation. On the other hand, we cannot conclude that all services applicants may have rendered Original Plaintiffs during this period were covered under the February agreement. For example, this is certainly the case with respect to the work performed by applicant Steven Bagwin of Eisenberg, who was retained by Original Plaintiffs on or about June 16, 1991. *See* Bagwin 6/5/92 Aff. ¶ 4; Ex. YYY. Moreover, we are reluctant to discount entirely the effect of the pendency of applicants' independent investigation and the prospects of an independent action ensuing therefrom on Melvin Hirsch's willingness to disclose and return his borrowings. Therefore we find that applicants may justifiably claim a fair portion of the $252,963, rather than the full amount, as a benefit for which they are entitled to legal fees.

■ TCC also suggests that it may be inappropriate to award counsel fees for benefits conferred upon the corporation prior to the commencement of Original Plaintiffs' suit. TCC contends that the only case cited by applicants permitting such fees, *Blau v. Rayette–Faberge, Inc.*, 389 F.2d 469 (2d Cir. 1968), requires fees to be recovered only if "the corporation had done nothing for a substantial period of time after the wrongful conduct had been brought to the board of directors' attention," and "the corporation's inaction appeared likely to continue." TCC Post–Hearing Memo. at 27. Such a reading

of *Blau* critically mischaracterizes the Second Circuit's decision.

In *Blau*, plaintiff's attorney advised the defendant corporation of an existing cause of action under section 16(b) of the Securities Exchange Act of 1934, and threatened suit after sixty days on the corporation's behalf if, by that time, the corporation had not been paid or had not commenced an action to recover the amounts due. *Blau*, 389 F.2d at 470. After the corporation had been paid within the sixty-day period, plaintiff brought an action to recover legal fees. The District Court granted summary judgment for defendants, but the Second Circuit reversed, stating that "there are circumstances in which an attorney's fee may be awarded for work done in discovering a valid section 16(b) claim for a corporation." *Id.* at 474. The Circuit Court did note that, in the context of a section 16(b) action, "[r]eimbursement for information leading to corporate recovery will be allowed only if the corporation has done nothing for a substantial period of time after the suspect transaction and its inaction is likely to continue." *Id.* at 473. TCC's contention that the "substantial period of time" is measured from some point after the corporation is made aware of the suspect transaction, rather than from the time of the suspect transaction itself, is thus inconsistent with the clear language of the Court's decision.[13] Moreover, the Court's analysis of the facts emphasizes this distinction:

> At the time of [counsel's] letter to the corporation, the statute of limitations had already run on the first series of Niemec's transactions, forfeiting a right to recover a sum allegedly exceeding $15,000. Moreover, eighteen months had already gone by since the corporation could first have sued on the second series of Niemec's transactions. Even [the corporation's] counsel was forced to admit, in his affidavit accompanying his motion for summary judgment, that the investigation of the facts with respect to Niemec's transactions did not

begin until [the corporation] received [counsel's] letter and demand.... Indeed, there appears to be no genuine issue as to whether [counsel's] letter was the "motivating" cause for the recovery, despite the corporation's formal denial that it was. On remand the district court should treat that issue resolved in the plaintiff's favor and confine itself to the amount of any fee to be awarded.

*Blau*, 389 F.2d at 474. We discuss *Blau* at length because TCC also relies on this case in other instances to seek diminution in the fees to be awarded applicants. TCC's reliance on *Blau* here, and elsewhere, is based on a reading that is inconsistent with both the plain language of the Court's opinion, and the underlying facts of the case.

### 2. *TCC's Receipt of $676,666 on Settlement*

Applicants claim that the receipt by TCC of $676,666 on settlement of this action is a liquidated monetary benefit for which they are entitled to an award of counsel fees. The major component of this settlement amount comprises the recovery from the Hirsches of the excessive compensation identified in the SBA letter of January 3, 1991 ($339,166). The other components include the contribution made by Melvin Hirsch to the Harvard Law School ($112,500), an allocation for wrongful loan losses ($130,000), and an amount constituting interest from the funds borrowed from the Special Account ($95,000).

TCC does not appear to contest vigorously the benefit conferred upon the corporation from the recovery of funds designated as excessive compensation. It is fairly clear that applicants advanced this claim while TCC appeared to be willing to permit Melvin Hirsch to reduce private capital unilaterally, and while no one at TCC, Leucadia, or BFP took affirmative steps to support plaintiffs' efforts in this regard. While TCC may argue that its counsel acted promptly and res-

---

13. In fact, the Second Circuit permitted plaintiff's counsel to recover fees, even though the corporation acted on plaintiff's claim promptly within the sixty-day time period allotted. The recovery was therefore based on the substantial period of eighteen months during which the cor-

poration "slept on its rights" prior to counsel's letter, rather than the relatively short period of time in which the corporation acted in response to the notification. *See Blau*, 389 F.2d at 472–74.

**1068**

ponsibly in obtaining a settlement that included this recovery, the facts and events leading up to settlement on the eve of trial reveal that it was plaintiffs and their counsel who alone pressed this claim. In fact, having been involved in this action since its inception, the Court concurs in applicants' assertion that TCC resisted, to some degree, Original Plaintiffs' efforts to recover the excess compensation.[14] TCC cannot rely now on its unsupported assertions that it would have acted to recover the compensation to defeat applicants' claim that their efforts were a competent producing cause of its recovery.

TCC also does not vigorously contest the $130,000 attributed to loan losses in the settlement. The primary argument advanced by TCC, in its pre-hearing briefs, was based on a misreading of *Blau* discussed above, and is therefore unpersuasive. Accordingly, the Court finds that applicants' actions were a competent producing cause of the $130,000 recovery.

■ With respect to the $95,000 designated as interest on the funds borrowed from the Special Account, TCC points to Melvin Hirsch's "willingness" to pay interest on his borrowings, the SBA's policy and practice of recovering such interest, and the fact that "TCC's Board certainly would have done something to collect the interest," to illustrate that applicants have not demonstrated that their efforts were a proximate cause of the recovery. TCC Post–Hearing Memo. at 28–32. The Court finds it difficult to exclude the acquisition of interest from the monetary benefits conferred upon the corporation under the rationalizations now advanced by TCC. The interest portion was part of the overall settlement of Original Plaintiffs' action and applicants pursued its recovery. TCC musters insufficient evidence to justify the conclusion that other factors or forces caused this recovery, or to speculate that interest would have been obtained without plaintiffs' action. What is certain, however,

is the fact that applicants included the recovery of interest as a claim in their complaint, and successfully moved for summary judgment to dispose of any conditions placed on the recovery of the borrowed amounts and interest thereon.[15] We believe it thus appropriate to consider the portion of the settlement designated as interest as a benefit to TCC for which applicants may claim a fee award.

■ With respect to the $112,500 allocated to the recovery of the Harvard contribution, TCC argues that applicants cannot obtained a fee award based upon this benefit because Original Plaintiffs' complaint did not contain a claim specifically referring to the contribution, and because plaintiffs' knew nothing about the gift until August 1991, when it was disclosed through discovery in this action. Even though applicants did not know of the donation prior to commencing the instant action, their actions clearly were a competent producing cause of its recovery because they played such a direct and immediate role in uncovering the illegal contribution. *See Mokhiber,* 608 F.Supp. at 627 (causation found where plaintiff's action may have caused company's accountants to be more attentive to details in an audit revealing unauthorized expenditures not specifically enumerated in plaintiff's complaint). TCC fails to cite any authority for the theory that applicants cannot recover fees for benefits obtained where the grounds for such benefits are not spelled out in the complaint, but later uncovered through applicants' efforts in discovery. Thus we find that the entire settlement amount of $676,666 constitutes a benefit to the corporation upon which applicants are entitled to a fee award.

### 3. Melvin Hirsch's Contribution To Legal Fees

■ TCC argues that applicants should not be credited for the $66,000 Melvin Hirsch

14. Applicants point to the several ways in which TCC resisted Original Plaintiffs' efforts to recover the excess compensation, including the conduct of its counsel BFP at depositions, and the assertion of the corporation, at one point, that its directors had ratified the Hirsches' compensation.

15. Applicants note that TCC did not lend its support to this motion. App. Post–Hearing Memo. at 14.

agreed to contribute toward counsel fees as part of the settlement because it was Paul Borden, rather than applicants, who negotiated that portion of the settlement. TCC Post–Hearing Memo. at 34. Hirsch settled, however, because trial was imminent on Original Plaintiffs' action; the terms of the settlement were designed to pass muster with plaintiffs, TCC shareholders and this Court. Consequently, we see no reason why this portion of the settlement agreement should be excluded from consideration as a basis for the award of legal fees.

### 4. Overfunding Of $49,000 In The Defined Benefit Pension Plan Due To Recovery of Interest on Melvin Hirsch's Borrowings

TCC argues that applicants were not a competent producing cause of this speculative or contingent benefit. Notably, TCC does not deny that it was through discovery in this action that applicants uncovered Melvin Hirsch's "borrowings" from the pension plan, nor that Melvin Hirsch is obligated to pay interest on the borrowings under the settlement agreement. Nor does TCC controvert the present existence of the overfunding due to this payment of interest, or the corporation's right to recover such overfunding. Consequently, we do not find that TCC's arguments justify ignoring this benefit as a basis for the award of legal fees.

### B. Unliquidated Monetary Benefits

Applicants seek to obtain a legal fee for the savings which TCC has experienced during the past year and may experience in the future by reason of the reduction in management compensation and expense attributable to the resignations of the Hirsches as officers and directors of TCC. While applicants submit that precision in the computation of such monetary benefits is unnecessary, they "conservatively" estimate the benefit to be well over $1,000,000. App.Post–Hearing Memo. at 31. These unliquidated monetary benefits

are claimed to come in two forms: 1) the future savings in management expense, and 2) the increase in price per share to TCC's shareholders.

### 1. Future Savings of Management Expense

Applicants introduced an exhibit at the hearing that listed the future savings and putative future savings applicants' efforts produced for TCC. See Ex. 3. After considering the items listed in this exhibit, we concur with TCC's counsel that each of these claims is, at best, tenuous and, at worst, frivolous.

Applicants claim a benefit from the savings in salary and employee benefits resulting from the elimination of the Hirsches as officers of TCC. The claim has little merit because the corporation was required to replace the Hirsches at approximately the same cost.[16] Melvin Hirsch was the CEO and President of TCC, while his wife Dorothy was the CFO, Secretary and Treasurer. Both worked full-time and their respective positions entailed substantial executive and administrative functions which obviously would have to be performed by others. Applicants' claim that TCC realized a savings from the elimination of Jonathan Hirsch's salary is equally baseless; Jonathan Hirsch has been employed by TCC continuously since June 30, 1986, and continued to be employed by the corporation at the time of the hearing. Applicants' contention that they were responsible for savings resulting from the elimination of annual directors' fees payable to the Hirsches appears frivolous. By a letter to the SBA dated February 1, 1991, Melvin Hirsch agreed to eliminate directors fees for TCC employees, apparently in compliance with an SBA finding, and, in fact, Melvin and Dorothy Hirsch did not receive any directors' fees in 1991. The same is true with regard to applicants' claimed savings in legal fees payable to Melvin Hirsch: in response to SBA's criticism, TCC

16. At the time of the hearing, Paul Borden was acting as TCC's President and Chief Executive Officer, in place of Melvin Hirsch. The annualized fee payable to Leucadia for Borden's services was not significantly less than the combined salary of Melvin and Dorothy Hirsch. Moreover, following Melvin Hirsch's resignation, TCC indicates it had to engage outside counsel to perform the legal services Mr. Hirsch was rendering the corporation at no charge. See Borden 8/10/92 Aff. ¶ 4; Ex. 1.

agreed to cease payments of legal fees to Mr. Hirsch almost six months prior to the institution of this action, and, in fact, TCC did not pay legal fees to Mr. Hirsch at any time after December 31, 1990. Applicants also claim a saving in the rent payable by TCC for Mr. Hirsch's law office, located within TCC's New York offices. Mr. Hirsch performed legal services solely for TCC, however, and the space used to perform such services was the same as that used to fulfill other executive and administrative functions for the corporation. *See* 11/9 Tr. at 65–66. There is thus nothing in the record to substantiate the savings applicants claim TCC obtained from the additional space hitherto used by Mr. Hirsch for legal work. While applicants claim responsibility for savings emanating from the removal of Ted Role from TCC's payroll, the record plainly shows the Ted Role was eliminated from the payroll by May 14, 1991, weeks before applicants indicate Original Plaintiffs engaged independent counsel. *See* Ex. G. With respect to the $12,000 applicants claim TCC will save annually in travel and entertainment expenses attributable to the Hirsches, the Court suspects there exist grounds to believe that the Hirsches abused the corporate travel and entertainment budget for personal purposes. However, applicants were unable to elevate this claim to any level beyond mere suspicion and therefore we cannot hold this to be a monetary benefit upon which applicants may obtain a fee award. *See* 9/21 Tr. at 82–88. As to the savings applicants claim TCC obtained from the purported closing of the Boston office, at the time of the hearing, TCC's Boston offices continued to remain open. Nor were applicants able to substantiate the claim of future benefits accruing to TCC from saved loan losses attributable to the Boston office. In short, applicants were unable to convince the Court of any the future savings in management expenses attributable to their efforts.

### 2. *Increase in TCC's Share Price*

■ In their post-hearing memorandum, applicants suggest that they conferred an unliquidated monetary benefit upon the corporation's shareholders by bringing about an increase in TCC's share price. Applicants contend that a derivative action which causes an increase in the company's share price constitutes a benefit upon which legal fees are clearly recoverable, citing *O'Neill v. Church's Fried Chicken, Inc.,* 910 F.2d 263 (5th Cir.1990). We note, however, that there are substantial differences with respect to causation between the present action and *O'Neill.* In the Fifth Circuit case, the corporation did not contest the finding that the derivative suit directly caused the increase in the price offered for the corporation's stock. *See O'Neill,* 910 F.2d at 267. In the instant action, there remains considerable doubt as to the degree Original Plaintiffs' action may have contributed to the rise in share price, as compared to other factors such as the increasing role played by Leucadia in the managing affairs of TCC, and the willingness of LNC to pay premiums to purchase stock control of the corporation.

In any event, to the extent that any increase in share price may be attributable to the benefits applicants' efforts have occasioned for TCC, we agree with TCC that applicants appear to be seeking a double recovery in their claim for fees based upon such increases in share price. Applicants first seek to collect fees for the monetary and non-monetary benefits their efforts produced for TCC, and then again recover for the gains realized by shareholders as a result of these same benefits conferred upon TCC. We believe it sufficient to consider the underlying benefits which applicants' efforts obtained for TCC as a basis for the fee award under this application.

### C. Non–Monetary Benefits

■ Applicants urge the Court to consider a variety of non-monetary benefits accruing to TCC as a consequence of their efforts. These benefits include the "cleansing of the corporate governance" from Hirsch control, the significant role played in restoring the viability of TCC as a going concern, the constraint upon TCC to make a proper provision for loan losses in its financial statements, the restoration in the confidence of lending institutions in TCC, the positive change in the SBA's attitude towards TCC, and the election of a proper Board of Di-

rectors consisting of at least 40% non-interested persons.

TCC acknowledges the removal of the Hirsches as directors to be a non-monetary benefit to the corporation, but argues that applicants may not assume credit for its occurrence. TCC contends that the SBA "had already started down the road" towards demanding their resignations, once it learned of Mr. Hirsch's borrowings from the Special Account. As already discussed, however, it was applicants' efforts that very likely prompted Melvin Hirsch to disclose his borrowings. While TCC now notes that the SBA had indicated to TCC's counsel and its operational consultant that the Hirsches should resign as directors as early as July 10, 1991, the record reveals that it was not until the hearing on the present application that the SBA's request was further disclosed by TCC, and it was not until July 21, after Original Plaintiffs' filed suit, that TCC's counsel communicated the SBA's request to the Hirsches' personal counsel. And while TCC points to the issuance of its July 11 press release concerning Melvin Hirsch's unauthorized borrowings as evidence of its "leaning" on the Hirsches to resign as directors, it is clear that the TCC Board took no formal steps towards this end and assumed a neutral position in the lawsuit on this issue. Applicants' efforts to remove the Hirsches, on the other hand, are clearly apparent from their June 24, 1991 meeting with the SBA, their proposals to the corporation before the initiation of suit, and their demand in the suit itself. The behavior of the corporation's Board during this period does not convince us that applicants are entitled to no credit for the removal of the Hirsches as directors of TCC.

TCC characterizes as "hot air" applicants' claimed credit for the re-emergence of TCC as a viable entity. TCC Post–Hearing Memo. at 51. TCC contends that the corporation never lacked viability, but that it had merely experienced "bad times" in the recent past. The events listed by TCC as comprising the "bad times" all appear to be incident to, if not a direct result of, the excesses of the Hirsch management. To claim that TCC remained viable during this period because the SBA never called for liquidation, the SEC never threatened an action, the corporation never filed for bankruptcy, and creditors never sued, is to ignore the seriousness of the condition of the corporation under the Hirsch management. While it is not certain that TCC was on the "road to liquidation," at least one director believed this to be the direction in which the corporation was moving, and there may even have been some consensus on the Board as to this opinion. See Ex. 5. TCC claims that the efforts of its new management, and in particular of Paul Borden and Martin Eisenstadt, are chiefly responsible for the "return to good times." While the new management likely had a significant favorable impact on the health of the corporation, it is clear that a large step towards rejuvenation occurred with the recovery of over $1,000,000 from the Hirsches and their elimination from corporate management as officers and directors. Applicants correctly assume responsibility for achieving these results, and therefore should be allotted a substantial share of the credit for TCC's re-emergence as a viable entity.

Applicants claim a non-monetary benefit for their efforts to require TCC to make a proper provision for loan losses in its financial statements. These efforts related to loan losses which were not provided for in prior financial statements and which were incurred due to the Hirsches' alleged waste. TCC responds that appropriate remedial action with regard to a loan-loss provision was promptly undertaken by the corporation's Board. The Board resolved, on June 26, to evaluate the adequacy of the loan-loss reserve and to retain Deloitte & Touche in connection with its subsequent financial statement. We believe applicants can claim some measure of credit for the establishment of appropriate reserves in TCC financial statements. After TCC's Board declined to adopt a resolution increasing TCC's loan-loss provision by $3,000,000, applicants sought to demonstrate the insufficient collateral for outstanding loan balances, notified the SEC, asserted the demand in the complaint, and pressed the claim on TCC's Board. Consequently, applicants may properly claim a fee award for benefits conferred when their efforts prompted the appropriate corporate re-

medial action, *see Koppel v. Wien*, 743 F.2d 129 (2d Cir.1984); *Kopet v. Esquire Realty Company*, 523 F.2d 1005 (2d Cir.1975); *Lewis v. Anderson*, 692 F.2d 1267 (9th Cir.1982), although this benefit is substantially subsumed within other benefits which resulted from it, including the respect and confidence of investors and lending institutions.

Applicants claim responsibility for restoring the confidence of TCC's banks in the corporation, noting that under the Hirsch management, TCC's lending institutions had requested that the company's collections of loan receivables be used to pay down existing bank loans, rather than be available for normal operations in making new loans. TCC's suggestion that the "obvious reason" for the banks' policy was the generally deteriorating economic climate and the conservative turn in lending practices due to highly-publicized savings and loan failures is difficult to accept; enough evidence exists as to the troubled conditions besetting TCC to infer that the banks' tightening policies towards the corporation were a response to circumstances specific to TCC. However, applicants presented little evidence at the hearing to justify the conclusion that their efforts were responsible for any restoration in bank confidence, rather than the efforts of the new Board and management, and LNC's recent sponsorship of TCC. The same is true with regard to applicants' claimed credit for the favorable change in the SBA's attitude towards TCC. Testimony at the hearing suggested that faith in TCC's current management, and in particular in Martin Eisenstadt and Paul Borden, may have contributed significantly to the SBA's change in attitude, so that applicants' efforts in removing the Hirsches as directors cannot be solely credited for this benefit. *See* 10/18 Tr. at 485.

Applicants also claim credit for TCC's election of a "properly constituted Board of Directors" in compliance with provisions of the Investment Company Act of 1940 ("1940 Act") that require at least 40% of the corporation's Board to consist of non-interested persons. Applicants asserted a claim that TCC's eight-member Board contained five interested persons,[17] but the election of four new directors to the TCC Board on October 31, 1991 cured any 1940 Act violation that may have existed. Applicants maintain they are entitled to an award of fees because a claim they asserted was mooted by the corporation's corrective action, citing *Koppel v. Wien*, 743 F.2d 129 (2d Cir.1984) (where lawsuit is mooted by defendants' corrective action, burden shifts to defendants to establish the absence of a causal connection). We are reluctant to impute the substantial weight applicants seek to this claim as an additional basis for the award of legal fees. Facts presented to the Court by TCC—developed after considerable discovery and offered at an evidentiary hearing—suggest that there may never have been a 1940 Act violation in the first instance, especially after the resignation of the Hirsches as directors. The Court will thus consider the fact that the benefit conferred upon the corporation by applicants efforts appears fairly uncertain because the underlying claim of wrongdoing remains rather tenuous.

Our evaluation of the benefits applicants claim were bestowed upon TCC as a consequence of their action leads to the following conclusions. With respect to the liquidated monetary benefits identified by applicants, we agree that the bulk of the benefits claimed are items for which applicants are entitled to an award of legal fees.[18] The total monetary value of such benefits is approximately $1,000,000.[19] With respect to

---

**17.** Initially, the three Hirsches, Paul Thorner and Lawrence Glaubinger were identified as interested persons; with the resignation of the Hirsches and the election of Paul Borden and James Jordan to the Board, applicants marked Jonathan Hirsch, Thorner, Glaubinger, Borden and Jordan as interested persons.

**18.** The only qualification concerns the repayment of borrowed funds from the Special Account. As our discussion indicated, we believe it appropriate to attribute to applicants a more limited

credit than that sought in relation to this recovery. This is certainly the case with applicant Fernbach, who was not retained by Original Plaintiffs until the date of the recovery, and therefore may not claim an entitlement to any fee award based upon this benefit.

**19.** The Court arrives at this figure by crediting applicants with approximately $200,000 of the $252,963 representing Melvin Hirsch's repayment of the funds borrowed from the Special Account.

the unliquidated monetary benefits estimated by applicants to be well over $1,000,000, we remain unconvinced that any of the items identified by applicants constitutes a benefit upon which legal fees are awardable. With respect to the non-monetary benefits claimed by applicants, we find that a fair portion of these advantages did in fact accrue to TCC as a result of applicants' efforts and will therefore accord them due weight in arriving at a fee award.

### III. *Compensation For Injunctive Claims*

TCC articulates two theories as to why applicants cannot recover legal fees for their efforts in seeking an injunction suspending or removing the Hirsches, Borden and Jordan as directors of TCC. First, TCC argues that the injunctive claims were essentially personal in nature, advanced for the purpose of enabling Original Plaintiffs' to acquire control of TCC and subsequently to restore Tanner's law firm as corporate counsel to TCC. Second, TCC argues that the injunctive claims provided TCC with little or no benefit.

With respect to the personal nature of the claims, TCC observes that several courts have disallowed recovery of legal fees for claims that are essentially personal in nature. *See, e.g., Davis v. Comed, Inc.,* 619 F.2d 588, 598 (6th Cir.1980) (plaintiffs' personal motives in bringing suit found sufficient to limit recovery of costs and attorney's fees to expenditures on services actually beneficial to the corporation); *Clark v. Lomas & Nettleton Financial Corp.,* 79 F.R.D. 641, 655–56 (N.D.Tex.1978), *vacated on other grounds,* 625 F.2d 49 (5th Cir.1980), *cert. denied,* 450 U.S. 1029, 101 S.Ct. 1738, 68 L.Ed.2d 224 (1981); *Saltzman v. Technicolor, Inc.,* 51 F.R.D. 178, 185 (S.D.N.Y.1970).

TCC argues that the primary impetus driving Tanner and Mautner to assert the injunctive claims was the acquisition of greater influence over the management of TCC. TCC contends that the personal nature of the injunctive claims is evidenced by: (i) the successful election of a relative of Tanner's law partner to TCC's Board in April, 1991, giving the "Tanner–Mautner group" three of eight Board seats; (ii) repeated meetings between Tanner, Mautner and Kass, a long-time friend of Mautner, primarily for the purpose of ascertaining whether Kass would be interested in becoming CEO and culminating in an agreement under which Kass would become CEO; (iii) confrontations with the Hirsches relating to the claims of excess compensation, with the intention of removing the Hirsches from power; (iv) oral and written offers by Tanner and Mautner to acquire TCC's stock in sufficient quantities to assure them of control of TCC; and (v) an initial reluctance to settle the lawsuit on terms highly favorable to TCC. In light of these facts, argues TCC, Original Plaintiffs' injunctive claims must be viewed as one of the mechanisms with which to acquire control of the corporation.

While the Court finds some evidence in support of TCC's theory, we do not believe the record contains sufficient proof to sustain a reduction in applicants' fee award on this ground. We also note that the history of Original Plaintiffs seeking settlement on the basis of giving Leucadia control, even before the action was commenced, and plaintiffs' offers to buy or sell TCC stock at the same price in September, 1991, are inconsistent with TCC's current contention that Original Plaintiffs' primary motivation was to obtain control of TCC. *See,* Tanner Reply Aff., July 30, 1992 at 10–17.

With respect to the argument that the injunctive claims provided TCC with little or no benefit, TCC notes that the conferring of a benefit on the corporation is a precondition to the recovery of legal fees in a shareholder derivative action. *See City of Detroit v. Grinnell,* 495 F.2d 448, 469–70 (2d Cir. 1974). TCC contends that, with the possible exception of Melvin Hirsch's resignation as a director, applicants' efforts on the injunctive claims did not result in any benefit to TCC. The larger portion of applicants' time on the injunctive claims was devoted to efforts to suspend or remove Borden and Jordan as directors. TCC maintains these efforts never conferred a cognizable benefit on the corporation because Borden and Jordan were never unseated and applicants never presented to the Court a compelling argument for such relief.

While the success obtained by applicants is certainly the crucial consideration in arriving at an appropriate fee award, the Court finds only limited merit in TCC's efforts to separate out and deny applicants compensation for the injunctive claims. In *Seigal v. Merrick,* 619 F.2d 160, 164–65 (2d Cir.1980), the Second Circuit held that:

> [W]e do not approve the deduction for work on legal theories that proved "unfruitful" but were not found to have been frivolous. Lawyers for plaintiffs and objectors in derivative and or class actions, no less than other litigators, must evaluate, accept and prosecute suits on the basis of the entire spectrum of theories that show early promise of vindicating their clients' rights. Every lawyer, indeed every judge, has pursued blind alleys that initially seemed reasonable or even professionally obligatory. To reward only the pursuit of a successful theory in cases such as this undercompensates the inevitable exploratory phases of litigation, and may also invite overly conservative tactics or even prohibit some high-risk but deserving actions entirely.

Numerous district courts have applied *Seigal* to allow compensation for legal theories that ultimately were not the basis for recovery. *See, e.g., Capozzi v. Albany,* 565 F.Supp. 771, 776 (N.D.N.Y.1983); *Vulcan Soc. of Westchester County v. Fire Dep't of White Plains,* 533 F.Supp. 1054, 1061 (S.D.N.Y.1982); *Stenson v. Blum,* 512 F.Supp. 680, 684 (S.D.N.Y. 1981); *Van Gemert v. Boeing Co.,* 516 F.Supp. 412, 416 (S.D.N.Y.1981).

Confronted with *Seigal,* TCC attempts to characterize applicants' injunctive claims as frivolous, noting that *Seigal* does not mandate compensation for claims that are both unfruitful and frivolous. *See Seigal* at 164. In considering applicants' injunctive claims previously, the Court made no finding that these claims were frivolous and the Court makes no such finding in the present context. Nor do we think it appropriate to identify and divide the hours applicants spent on a claim-by-claim basis, as TCC urges. Rather, as our discussion of the benefits obtained by applicants efforts' indicates, we prefer to "focus on the significance of the overall relief obtained" by applicants in arriving at the proper figure to award for legal fees. *Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983).

## IV. *Applicants' Misconduct and Conflict of Interest*

TCC argues that applicants should not be allowed to recover legal fees because of alleged misconduct in connections with (i) Tanner's disclosures relating to TCC's loan to Cab Limo Corp.; (ii) Tanner's failure to inform various defendants that he had formed the opinion that the compensation paid to the Hirsches was excessive; and (iii) Tanner's refusal to go forward with settlement until his firm's pre-existing legal fees were satisfied.

With respect to Tanner's revealing TCC's wrongdoing in connection with the Cab Limo Loan, TCC argues that Tanner's disclosure was serious misconduct because it breached the attorney-client privilege, placed Tanner in a conflict between a former client, TCC, and Tanner's present client in this action, and constituted an effort by Tanner to profit from information he had obtained as an attorney for TCC. The Court finds no merit in TCC's position. As applicants note, the report on the Cab Limo Loans was communicated at a Board meeting attended by invitees under circumstances which preclude the accrual of an attorney-client privilege. Moreover, Tanner had not formally represented TCC in any matter relating to the Cab Limo Loan. Accordingly, TCC's claims as to Tanner's misconduct in this regard must fail.

█ Similarly untenable is TCC's misconduct claim based on Tanner's failure to inform various defendants that he had formed the opinion that the compensation paid to the Hirsches was excessive. TCC charges that Tanner should have known of the excessive compensation because he was a friend of and occasional attorney for Hirsch, attended TCC directors and stockholders meetings, and performed substantial legal services for TCC. There is no showing, however, that Tanner's law firm had ever been requested to represent TCC in connection with setting or approving any compensation or legal fees paid

to any officer or director of TCC. Nor is there any showing that Tanner's firm represented TCC with respect to any application to SBA to approve such compensation or any other action before SBA, other than approving TCC's certificate of incorporation. Thus, TCC's theory of knowledge by association does not suffice to establish misconduct on Tanner's part sufficient to negate a claim for attorney's fees.

The Court also finds no merit in TCC's claim that fees should be disallowed under this application because Tanner refused to go forward with settlement until his pre-existing legal fees were satisfied. Our review of the record relating to this matter reveals no impropriety in Tanner's position. *See* 11/10 Tr. 185–92. The question of pre-existing legal fees apparently arose within the context of the releases drawn as part of a proposed settlement agreement. Tanner appears to have been willing to reserve the question of legal fees for future litigation, provided he did not have to relitigate issues from the action purportedly being settled. While Tanner appears to have been averse to the breadth of the releases demanded from him, there is nothing in the record to suggest that he blocked settlement of the derivative action in order to settle first his claim for pre-existing fees. *See* 11/10 Tr. 185–92.

■ TCC additionally argues that Tanner, by acting as the attorney for Original Plaintiff Tanner & Gilbert P.C. Retirement Plan Trust (the "Tanner Trust") of which he is a trustee and beneficiary, placed himself in a conflict in which his interest as an attorney dominated his interest as a representative of TCC's stockholder class. TCC contends that under the circumstances, the Court should deny Tanner any legal fees whatsoever. TCC cites a number of class action cases in which a plaintiff failed in his efforts to be certified as a class representative because he was represented by himself or a by law firm with which he was affiliated. *See, e.g., Brick v. CPC Int'l., Inc.,* 547 F.2d 185, 186 (2d Cir.1976); *In re AM Int'l., Inc.,* 108 F.R.D. 190, 197 (S.D.N.Y.1985); *Tanzer v. Turbodyne Corp.,* 68 A.D.2d 614, 417 N.Y.S.2d 706, 707–09 (1st Dept.1979). TCC notes further that a reason often given for denial of class

certification is that the class representative is so closely associated with the class attorney that there exists a reasonable basis for apprehension that the attorney will permit settlement on terms that are less favorable to the interest of the members of the class than to himself. *See Susman v. Lincoln American Corp.,* 561 F.2d 86 (7th Cir.1977); *Stull v. Pool,* 63 F.R.D. 702 (S.D.N.Y.1974).

■ TCC's reliance on these class action cases, which based their holdings on the failure to meet criteria for class certification, is misplaced in the present context. Unlike class action cases, derivative actions do not require court authorization to be brought. The cases cited by TCC are thus only tangentially relevant in the present context. Moreover, as the cases cited by TCC affirm, there is no per se rule in this Circuit prohibiting a plaintiff who is affiliated with or related to the attorney representing him from being named as the class representative. *See Brick,* 547 F.2d at 186–87; *In re AM Int'l.,* 108 F.R.D. at 197–98. The matter is left to the Court's discretion.

TCC does cite one shareholder derivative case in support of its position on this issue. In *Eisenberg v. Central Zone Property Corp.,* 1 A.D.2d 353, 149 N.Y.S.2d 840 (1st Dept. 1956), *aff'd,* 3 N.Y.2d 729, 163 N.Y.S.2d 968, 143 N.E.2d 516 (1957), a lawyer who was a small minority stockholder acting as his own attorney commenced derivative actions which may have resulted in a non-monetary benefit to the corporation. The Court noted that it had a "serious question," as a matter of public policy, "whether a stockholder instituting a derivative action against a corporation should be allowed compensation as an attorney in the litigation." *Id.* at 842, 163 N.Y.S.2d 968, 143 N.E.2d 516. The Court further remarked that "the institution of such actions and the undertaking of litigation for the purposes of seeking a counsel fee should not be encouraged." *Id.*

The *Eisenberg* dictum cited by TCC is inapplicable because the present action clearly conferred substantial monetary benefit upon the corporation and there is no indication that this litigation was undertaken merely for the purpose of seeking a counsel fee. It should be noted, moreover, that the *Eisen-*

**1076**

*berg* Court did ultimately award an attorney fee, albeit a reduced one, due to the fact that counsel did not enter that case until just prior to argument before the Court of Appeals.

In short, because TCC has stated no valid reason for the Court to disqualify Tanner based on an alleged conflict of interest, the Court will not deny applicants legal fees on this ground.

## V. *Inefficient Prosecution and Failure to Maintain Adequate Time Records*

■ TCC maintains that even where attorneys representing class plaintiffs have devoted time to compensable claims, courts have often awarded them less than their requested time charges when circumstances so warranted. For example, downward adjustments may be appropriate for overstaffing, as well as for other forms of inefficient or duplicative work. *See Seigal,* 619 F.2d at 164 n. 9 ("ample authority supports reduction in the lodestar figure for overstaffing as well as for other forms of duplicative or inefficient work"); *Kronfeld v. Transworld Airlines, Inc.,* 129 F.R.D. 598, 602 (S.D.N.Y.1990). Courts have also imposed reductions where it appears that large amounts of time were spent on routine ministerial matters, more appropriately suited to performance by junior attorneys or paralegals whose services are billed at a lower rate. *See, e.g., Lewis* at 444; *Barnett v. Pritzker,* 73 F.R.D. 430, 433 (S.D.N.Y.1977).

With respect to TCC's overstaffing claims, the Court will not grant any reductions in the lodestar amount because TCC's claims are conclusory, the Court's own review of applicants' submissions does not reveal overstaffing, and the Second Circuit has expressed reluctance to allow reduction for work merely alleged to be duplicative. *See Seigal,* 619 F.2d at 164 (we would be more reluctant than the district court to deprive a lawyer of the aid of even one associate in conferences or court appearances when, as here, he was often confronted with a bevy of hostile lawyers).

■ TCC's claim as to excessive use of high-billing personnel is more convincing.

As TCC observes, throughout the course of the litigation applicants employed partners to conduct discovery, legal research and other clerical tasks. Applicants also employed associates for tasks more appropriately suited to non-legal personnel. For example, of the 26.1 hours submitted by Mitchell Lapidus, a partner in Tanner's firm, approximately 22 hours was spent on "legal research," "shepardizing," and "gathering cases." Additional time was spent by Lapidus "photocopying" and "organizing packets." Other improper uses of expensive personnel include: (1) several thousand dollars billed by Anders Sterner, a partner in Tanner's firm, in the preparation of proxy forms, posters, shareholder filings and in preparing deposition abstracts; (2) several thousand dollars billed by John Fernbach, a senior attorney and second in charge of the entire litigation, in the preparation of deposition summaries; (3) at least $5,000 billed by Morris Simkin, a partner in Tanner's firm, for tasks such as document production and legal research; and (4) $110 per hour billed for a Tanner associate for delivering papers to Court or to adversaries.

In light of these practices, which are illustrative of a wider pattern on overbilling, the Court finds that a $30,000 reduction in Tanner's lodestar amount is warranted.

■ TCC also takes issue with the time records submitted by Tanner's firm, contending that they do not substantiate Tanner's claim that his time records and those of other Tanner Propp personnel are maintained on a contemporaneous daily basis. TCC's objection centers on the fact that Tanner's firm enters only monthly time totals into the computer for billing purposes, even though the attorneys at the firm assert that they maintain separate daily memoranda of their time. TCC contends that Tanner Propp personnel should have provided the Court with copies of illustrative contemporaneously prepared hand-written or typed memoranda, instead of the recopied daily records provided for most attorneys.

■ The Court finds little merit in TCC's position. It is true that contemporaneous time records are a requisite to receiving attorneys' fees. *See New York State Association For Retarded Children, Inc. v. Carey,*

711 F.2d 1136, 1147 (2d Cir.1983). "These records should specify, for each attorney, the date, the hours expended, and the nature of the work done." *Id.* at 1148. However, failure to present copies of original diaries does not mandate a reduction in attorneys' fees. *See Wilder v. Bernstein,* 725 F.Supp. 1324, 1334 (S.D.N.Y.1989) (verbatim transcriptions of daily entries with supporting affidavits satisfied contemporaneous time record requirement); *United States Football League v. National Football League,* 704 F.Supp. 474, 477 (S.D.N.Y.), *aff'd,* 887 F.2d 408, 415 (2d Cir.1989) (re-typed computer records satisfied *Carey* requirements).

Here applicants have, with one exception, provided adequate retyped daily entries with supporting affidavits as to their accuracy and thus the Court will make no deductions based on failure to comply with the contemporaneous time record requirement.

■ The one noted exception to this finding applies to Raymond Fersko, a partner at Tanner Propp, whose 46.8 hours of time billed in the instant case are not supported by a daily breakdown but are lumped together in monthly blocks. Accordingly, the Court finds that Fersko's hours, which account for $12,508.50 of the Tanner application, do not meet the *Carey* standards and should be disallowed in their entirety.

■ TCC further notes that where the time records submitted in support of a fee application lack sufficient specificity for the Court to assess the reasonableness of the amount charged in relation to the work performed, the Court is justified in reducing the hours claimed for those entries. *See, e.g., National Football League,* 704 F.Supp. at 486; *Meriwether v. Coughlin,* 727 F.Supp. 823, 827 (S.D.N.Y.1989).

TCC finds particular fault in applicants' request for paralegal compensation, noting that while Tanner seeks compensation for $34,220.95 worth of paralegal time, he has failed to produce any records which substantiate the nature of the work performed by each of these individuals. The paralegal time records merely record the hourly rate charged and amount of time spent by each paralegal. TCC correctly observes that un-

der these circumstances, it is impossible to ascertain the appropriateness of the time expended by each paralegal, and, more importantly, whether such time was spent in furtherance of compensable claims. Accordingly, Tanner's paralegal claims will be reduced by 50%. The Court will not reduce paralegal fees any further because some compensation for paralegal services is clearly reasonable in the instant case.

■ TCC also takes issue with the time records submitted by applicant Fernbach. Mr. Fernbach submitted two time records, a day book containing very brief, and often vague or uninformative entries, and a reconstructed time record containing more detailed entries. *See* Ex. 13 and Ex. XXX. TCC points to inconsistencies in the two records and urges the Court to impose an appropriate penalty. *See* 11/10 Tr. at 148–54. We believe a reduction of $10,000 in Fernbach's lodestar figure is warranted.

## VI. *Legal Fees For Time Devoted To This Application*

■ Applicants seek an award of fees for their time devoted to this application in the following amounts:

| | |
|---|---|
| Tanner | $45,750 |
| Fernbach | $29,575 |
| Bagwin | $12,582 |

TCC contends that such fees must be denied because the instant action represents a "common fund" case "where the benefit is the creation of a fund for a group or class of persons that is already diminished by the award of fees and would be further diminished by any additional award for fee applications." TCC Post–Hearing Memo. at 79–80; *See Donovan v. CSEA Local Union 1000,* 784 F.2d 98, 106 (2d Cir.1986); *Gagne v. Maher,* 594 F.2d 336, 344 (2d Cir.1979); *Kinney v. International Brotherhood of Elec. Workers,* 939 F.2d 690, 694 (9th Cir.1991). The common fund cases referred to by TCC, however, are traditionally class actions where a sum of money is recovered for the class. To the extent attorneys fees are paid out of the common fund, an award for fee applications would further reduce the amount distributable to the class. The instant action, on the other hand, is a derivative suit that resulted

in monetary and non-monetary benefits for the corporation, which form the basis for an award of legal fees. Thus TCC fails to convince us that fees for time devoted to this application should be entirely disallowed on this basis.

## VII. Disbursements and Pre-Judgment Interest

TCC argues that applicants' disbursements attributable to the injunctive claims should be disallowed. We disagree, for the same reasons set forth in our discussion regarding these claims.

With regard to applicants' request for pre-judgment interest, we do not believe this is an appropriate case for such an award. The delays in payment have not been substantial and are the consequence of bona fide disputes as to what constitutes a reasonable fee award under the present circumstances. We therefore choose not to grant any pre-judgment interest on the fees awarded under this application.

## VIII. Calculating An Appropriate Fee Award

Based on our discussion of the benefits conferred upon TCC as a consequence of applicants' efforts, we find that a 40% reduction in the lodestar figure submitted by applicant Tanner ($431,440) is warranted. The Court first makes deductions from the lodestar figure submitted in the amounts of $30,000 due to the Tanner firm's pattern of overbilling, $12,508.50 for Raymond Fersko's hours which were not supported by daily time records, and $17,110 due to the failure to provide adequate time records for paralegals. This yields a figure of $371,821.50, which, after the 40% reduction, results in a fee award of $223,092.90. To this we add $54,574 for disbursements, resulting in an award of $277,666.90. We also consider it appropriate to reduce the figure submitted for time devoted to this application ($45,750) by 40%, resulting in a fee amount of $27,450 for this application. Applicant Tanner's total fee award under this application thus becomes $305,116.90.

With respect to applicant Fernbach, we find a 50% reduction in the lodestar figure submitted ($130,500) to be appropriate. The Court first deducts $10,000 for failure to maintain adequate time records. This yields a figure of $120,500, which, after the 50% reduction, results in a fee award of $60,250. To this we add $792 for disbursements, resulting in an award of $61,042. We also consider it appropriate to reduce the figure submitted for this fee application ($29,575) by 40%, resulting in a fee amount of $17,745 as appropriate for time dedicated towards this application. Applicant Fernbach's total fee award under this application thus becomes $78,787.

With respect to applicant Bagwin of Eisenberg, we find a 40% reduction in the lodestar figure submitted ($49,992) to be appropriate, resulting in a figure of $29,995.20, to which we add $84 for disbursements. Consistent with our approach for the other two applicants, we reduce the figure submitted for this fee application ($12,582) by 40%, resulting in a fee amount of $7,549.20 for the time devoted on this application. Applicant Bagwin's total fee award under this application thus becomes $37,628.40.

The total fee awarded applicants under this approach is $421,532.30. This amount represents approximately 42% of the $1,000,000 in monetary gains found to accrue to TCC as a result of applicants' efforts. Of course, applicants' actions were also found to confer substantial non-monetary benefits to TCC. Consequently, we believe the amounts awarded under this application are an adequate measure of the fees reasonably due applicants for all the benefits bestowed upon the corporation as a result of their efforts.

## CONCLUSION

For the foregoing reasons, the Court finds the following fee awards to be appropriate under this application. Applicant Tanner shall receive a total fee award of $305,116.90 for the time devoted to the case-in-chief and to this application. Applicant Fernbach shall receive a total fee award of $78,787, and applicant Bagwin shall obtain a total award of $37,628.40.

SO ORDERED.