OPINION OF THE COURT
David Goldstein, J.
The action raises a novel issue, of apparent first impression in this State, relating to the impact upon class action certification of the relationship between the purported class representatives and counsel and alleged unethical conduct by each, which may have impinged upon the integrity of defendants’ right to counsel and attorney-client privilege. The issue is raised in the context of plaintiffs’ motion for class action certification, pursuant to CPLR article 9.
FACTS
The action was brought by three New York families, who had entered into retail installment and disclosure agreements with Outdoor World Corporation, for the purchase of campground and vacation club memberships. Outdoor World is a wholly owned subsidiary of Resorts USA, Inc. (formerly Rank Anhert, Inc.). The purported class is said to be all those who entered into such agreements prior to December 31, 1995, a proposed class of nearly 5,500.
Outdoor World maintains 15 campground locations, which furnish relatively inexpensive lodging for members. Memberships are sold and, in addition, require an annual dues payment toward upkeep and management, plus established rates for actual use of the facilities. Membership plans range from $7,000 to $18,000 and there are also membership upgrades, which result in enhanced benefits. Thus, a Travel Masters membership permits members to use other campgrounds, which have reciprocal arrangements with Outdoor World and, further, offers preferential access to travel services and lodging accommodations.
*356 For the most part, memberships are solicited by direct mail or by word of mouth. Prospective members are invited to visit an actual campground or a sales center, where they receive a tour of the facility, are shown videos and brochures, and are subjected to sales pressure techniques to promote the various memberships. According to plaintiffs, prospective members are induced by representations that they would receive the highest quality travel and vacation services at competitive prices and that these claims were false, both in terms of the services furnished and the degree of availability of the facilities.
The Meachums were solicited by Outdoor World through an August 1992 mailing, stating they had won a prize which they could obtain after attending an Outdoor World presentation. On August 8, 1992, the Meachums purchased a Pioneer Plus membership and proceeded to visit four Outdoor World facilities during the next eight months, the last on March 1, 1993 (Orlando, Fla.). One month later, in April 1993, the Meachums upgraded to a Master Plus membership in order to be able to use the facilities during "holiday weekend periods”.
Edmond Meachum is employed at Sedgwick, Detert, Moran & Arnold, the law firm representing plaintiffs. At the present time, the firm also employs Mr. Montanez and formerly employed Maureen Peace. Mr. Meachum supervises the law firm’s file department, which allegedly includes the file in this very action. Adrian Montanez had worked under Meachum and is now a case assistant. Mrs. Peace had been a word processor with the firm for many years.
Although the Montanezes had received a mail solicitation, they did not go to a sales presentation until after they had talked to the Meachums. They entered into an Adventurer Plus membership on August 14, 1992, at Outdoor World’s Timothy Lake facility. They used their membership four times after the initial Timothy Lake trip, but personally experienced problems only once.
The Peaces were referred to Outdoor World by Meachum and entered into a Charter Plus membership on February 26, 1993, at Outdoor World’s sales center in Garden City, New York. They claim they had difficulty making reservations at Outdoor World facilities but, after making reservations for Memorial Day 1993, and being unable to use them, the Peaces upgraded their, membership. After making successful reservations in October 1993, Mr. Peace became ill and they cancelled their reservation. Outdoor World agreed to refund the reservation fees upon receipt of a doctor’s note, but, after obtaining *357 the note, Mrs. Peace did not send it, instead, withholding further payments as of December 1993.
The Montanezes and Peaces initially turned to Jack Gross, an attorney at Sedgwick, Detert, Moran & Arnold, who wrote a letter to Outdoor World on their behalf on December 10, 1993. He complained of alleged breaches of contract and informed Outdoor World that he had advised his clients to cease further payments. A response from Outdoor World’s legal department refused to cancel the membership contracts and denied that there had been any misrepresentations. The letter, dated January 24,1994, further requested that any future correspondence be with the legal department.
Thereafter, somewhat dissatisfied, Montanez spoke to Meachum and both consulted with Peter Kutil, a partner at the law firm. During August 1994, Mr. Kutil came up with the idea and obtained the necessary equipment for Montanez to tape-record a conversation with a supervisor of Outdoor World’s financial department, who admitted that Outdoor World would not cancel Montanez’ contract. This recording was allegedly to obtain substantiating information to aid in framing a complaint in this action.
The action was filed on December 29, 1994, plaintiffs seeking to represent the class of some 5,469 New York residents, all of whom had allegedly been victimized by similar misrepresentations and deceptive practices made to induce plaintiffs and others to enter into similar vacation contracts. In terms of class action certification, the relevant inquiry is whether the statutory criteria contained in CPLR 901 et seq. have been satisfied.
CPLR ARTICLE 9
Under CPLR 901 (a), one or more members of a class may commence a representative or class action on behalf of all others similarly situated if:
(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class which predominate over questions affecting only individual members;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;
(4) the representative parties will fairly and adequately protect the interests of the class; and
(5) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.
*358 Upon a motion for class action certification, movant has the burden of establishing the necessary prerequisites for CPLR 901 (a), which must be satisfied by more than mere conclusory allegations. (Brandon v Chefetz, 106 AD2d 162; Katz v NVF Co., 100 AD2d 470.) Whether or not to certify a class is within the court’s discretion, with the statute to be liberally construed to give effect to the policy of the State, which favors the maintenance of class actions. (Brandon v Chefetz, supra.)
Adequacy of Representation — CPLR 901 (a) (4)
The critical issue in this case is the adequacy of representation, both in terms of plaintiffs as class representatives and counsel, and the impact of alleged improper or unethical conduct by each. The necessity of fair and adequate representation, it has been observed, is "perhaps the most crucial requirement” in determining whether class action status should be conferred. (Cannon v Equitable Life Assur. Socy., 106 Misc 2d 1060, 1068, revd on other grounds 87 AD2d 403.) This applies under CPLR 901 (a) (4), as well as Federal Rules of Civil Procedure, rule 23 (a), upon which CPLR article 9 was based.
" 'Adequate representation depends on two factors: (a) the plaintiff’s attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class.’ ” (Susman v Lincoln Am. Corp., 561 F2d 86, 90, citing Wetzel v Liberty Mut. Ins. Co., 508 F2d 239, 247, cert denied 421 US 1011.)
I. Attorney Qualifications and Actions
The conduct of plaintiff’s counsel, particularly the ethical considerations of such conduct, is a factor in considering the adequacy of representation. (Cannon v Equitable Life Assur. Socy., 106 Misc 2d, supra, at 1069.) Although a slight breach of ethics may be overlooked in light of the circumstances,[1] or a reasonable, good-faith belief of propriety,[2] serious misconduct does constitute a ground for denial of class action status. (See, Korn v Franchard Corp., 50 FRD 57 [SD NY 1970], revd on *359 other grounds 456 F2d 1206 [2d Cir 1972];[3] Halverson v Convenient Food Mart, 458 F2d 927, supra.)[4] As the Seventh Circuit Court of Appeals observed in Halverson (supra, at 932), "[o]nly the most egregious misconduct on the part of plaintiffs’ lawyer could ever arguably justify denial of class status.”
In adherence to the Federal cases on the issue, the New York courts have also recognized that "solicitation is endemic to class action certification cases.” (Stern v Carter, 97 Misc 2d 775, 779, mod on other grounds 82 AD2d 321.) Upon this basis, the late Hon. Seymour Lakritz of this court, citing the propriety of considering the ethical conduct, competence, experience and zeal of plaintiffs’ counsel, observed in Cannon v Equitable Life Assur. Socy. (106 Misc 2d, supra, at 1069): "Class action status should be denied where counsel’s unethical conduct has been or is prejudicial to the interests of the class or results in creating a conflict of interest between the attorney and the class and the attorney is therefore unable to protect the interests of the class (Korn v Franchard Corp., 456 F2d 1206; Taub v Glickman, 14 FR Serv 2d 847). Generally, the unethical conduct condemned by the courts has been egregious misconduct or extreme examples of solicitation and champerty”. (Citations omitted.)
In our case, defendants raise critical ethical questions concerning the propriety of certain conduct by the putative class counsel, specifically, that Peter Kutil and certain of the class representatives were involved in a clandestine tape recording of a telephone conversation with a supervisory employee of Outdoor World, at a time when they knew or should have known that defendant was represented by counsel. It is further claimed that one of the attorneys, Jay Taylor, was involved and/or responsible for the activities of his mother, Naomi Taylor, who had taken a trip to one of defendants’ campground sites and thereafter sought to solicit another to contact her son, as the person representing plaintiffs in this class action. Both acts are alleged to be violations of Code of Professional *360 Responsibility DR 7-104 (A) (1) (22 NYCRR 1200.35 [a] [1]), which prohibits communications between an attorney or a lawyer’s agent and. a represented party, and DR 1-102 (A) (4) (22 NYCRR 1200.3 [a] [4]), which prohibits "conduct involving dishonesty, fraud, deceit, or misrepresentation.” In terms of the trip by Naomi Taylor to Timothy Lake, it is also claimed that, as an agent of her son, she engaged in improper precertification solicitation of class members.
(A) Tape-Recorded Conversation of August 1994.
In August 1994, Adrian Montanez, accompanied by Peter Kutil, while in the latter’s office, tape-recorded a conversation with an Outdoor World supervisor to confirm that defendant would not permit him to cancel his contract without the involvement of an attorney. It is alleged that this was to put an end to harassing telephone calls he had been receiving. The recording was done to acquire information to be used in framing and to fortify allegations to be made in the complaint. As a result, substantial questions regarding the adequacy of counsel are raised, in addition to the alleged violation of certain disciplinary rules by this clandestine recording.
DR 7-104 (A) (1) (22 NYCRR 1200.35 [a] [1]) provides, "During the course of the representation of a client a lawyer shall not ** * * [c]ommunicate or cause another to communicate * * * with a party the lawyer knows to be represented by a lawyer in that matter unless the lawyer has the prior consent of the lawyer representing such other party or is authorized by law to do so.” The rule preserves and promotes the integrity of the attorney-client relationship, by preventing situations where a represented party is attempted to be taken advantage of through the skill of an adversary’s attorney and, further, prevents an attorney "from circumventing opposing counsel to obtain unwarranted concessions or liability-creating statements or disclosures from a party”. (See, Miano v AC & R Adv., 148 PRD 68, 75, adopted and approved 834 F Supp 632 [SD NY 1993].)
The analysis under DR 7-104 (A) (1) (22 NYCRR 1200.35 [a] [1]) is bifurcated. Initially, it must be determined whether the contact was with a "party” and, if so, whether the adverse party was known to be represented. Plainly, there is little difficulty in determining the applicability of DR 7-104 (A) (1) (22 NYCRR 1200.35 [a] [1]), when defendant is an individual. However, when the defendant is a corporation, the issue is compounded since, by definition, a corporation can only act *361 through natural persons. Further, there is disagreement among the courts as to which corporate employees constitute "parties”. The operative rule does not define "party” in the context of a corporation, and a variety of tests have been applied by the courts. (See, Sinaiko, Ex Parte Communication and the Corporate Adversary: A New Approach, 66 NYU L Rev 1456, 1482-1493.)
In Niesig v Team I (76 NY2d 363), the Court of Appeals adopted a test which has been widely cited and adopted. (See, Bouge v Smith’s Mgt. Corp., 132 FRD 560 [Utah 1990]; Dent v Kaufman, 185 W Va 171, 406 SE2d 68 [1991] [concluding that the Niesig test was the "best approach”].) The Niesig Court reviewed the litany of tests and settled upon one which it believed "best balances the competing interests, and incorporates the most desirable elements of the other approaches,” namely, "one that defines 'party’ to include corporate employees whose acts or omissions in the matter under inquiry are binding on the corporation (in effect, the corporation’s 'alter egos’) or imputed to the corporation for purposes of its liability, or employees implementing the advice of counsel.” (Niesig v Team I, 76 NY2d, supra, at 374.) This standard, the Court found, would address the "potential unfair advantage of extracting concessions and admissions from those who will bind the corporation [which would be] negated when employees with 'speaking authority’ for the corporation, and employees who are so closely identified with the interests of the corporate party as to be indistinguishable from it, are deemed 'parties’ for purposes of DR 7-104 (A) (1).” (Supra, at 374.) In doing so, the Court recognized that the operative standard prohibited contact by opposing counsel only with those employees who had legal power to bind the corporation, or who were responsible for implementing the advice of the corporation’s attorney, or any member whose own interests were directly at stake. This test, the Court believed, struck the correct balance and "specifically targeted” the problem which DR 7-104 (A) (1) (22 NYCRR 1200.35 [a] [1]) addresses.
In Cole v Appalachian Power Co. (903 F Supp 975 [SD W Va 1995]), the court listed among those employees who were available for ex parte interviews, those whose positions were incapable of imputing liability to or binding the corporation. (Supra, at 979-980.) The court explicitly rejected ex parte communications with employees who had supervisory positions, unless there was notice to and consent from counsel. (Supra.) Significantly, while the Cole court based its analysis upon a *362 combination of the Official Comment to ABA Model Rules of Professional Conduct rule 4.2 and Federal Rules of Evidence, rule 801 (d) (2) (D) test, as well as Niesig (supra), the actual standard adopted would prohibit communications with essentially the same employees as in Niesig.[5]
In Miano v AC & R Adv. (148 FRD 68, adopted and approved 834 F Supp 632, supra), the court cited both Niesig (supra) and the Official Comment to rule 4.2 of the ABA Model Rules of Professional Conduct in terms of what constitutes a "party” in the context of a corporate defendant. It held that an employee would be considered a "party” for purposes of DR 7-104 (A) (1) (22 NYCRR 1200.35 [a] [1]) if "(1) he/she had high-level managerial responsibility and was capable of binding the corporation; or (2) his/her acts or omissions may be imputed to the corporation for purposes of civil or criminal liability; or (3) his/ her statements may constitute an admission”. (Miano v AC & R Adv., 148 FRD, supra, at 76-77.)
In the within action, plaintiffs contend that Corine Baird, supervisor of the financial department at Outdoor World, was not a party and, therefore, the question of communication with a represented party is inapplicable here. This, however, is refuted by the actions of both Montanez and Kutil. The telephone call to Outdoor World was admittedly made to gain an admission, which, of necessity, would have to come from one with authority to speak for or bind the corporation. (Cf., Loschiavo v Port Auth., 58 NY2d 1040.) The transcript of Montanez’ deposition does not reflect any request that Outdoor World cease further "harassing” telephone calls, which is represented to be one of the reasons for the call. Rather, the transcript evinces a carefully planned strategy to obtain specific information from Ms. Baird and a concession by her on behalf of Outdoor World, which, plaintiffs admit, was to serve as a basis for the preparation of the complaint.
As noted, Ms. Baird’s employment was as a supervisor in the financial department. Without doubt, she was not senior management but, as the Court of Appeals recognized in Niesig *363 (supra), in rejecting the "control group” test, "corporate employees other than senior management also can bind the corporation”. (Niesig v Team I, supra, at 373.) Unlike the situation in Niesig, which dealt with employees who were low level and who had merely witnessed an accident for which the corporation was being sued, our case concerns a supervisor, not a mere "rank-and-file” employee. As was observed in Cole v Appalachian Power Co. (903 F Supp, supra, at 979-980), supervisors have significant managerial responsibility, sufficient to preclude ex parte communications.
Moreover, in Niesig (supra), the Court of Appeals cautioned that the danger of overreaching in terms of ex parte communications should be met by the conduct of attorneys, ethically, to act as attorneys, since "it is of course assumed that attorneys would make their identity and interest known to interviewees and comport themselves ethically.” (Niesig v Team I, supra, at 376.) Insofar as applicable here, Mr. Kutil was candid neither about his interest nor his identity. His presence during the telephone conversation was not disclosed — he remained silent as Montanez stated that he wished to proceed without an attorney. This, in my view, was highly improper.
Plaintiffs in this case assume the position that there was nothing illegal about the taping, since, in New York, one party to a conversation may record it, and further, neither Kutil nor the class plaintiffs knew whether Outdoor World was actually represented by counsel when the taped conversation took place, since no litigation had been commenced. However, the fact that Outdoor World was not an adversary in any actual litigation at the time of the conversation is not dispositive. Clearly, litigation was contemplated, since that was one of the purposes underlying the telephone call. Also, contrary to plaintiff’s position, it has been recognized that DR 7-104 (A) (1) (22 NYCRR 1200.35 [a] [1]) has force and effect prior to the actual commencement of litigation. (See, Miano v AC & R Adv., 148 FRD, supra, at 77, citing, inter alia, United States v Hammad, 858 F2d 834, 839; United States v Guerrerio, 675 F Supp 1430, 1438, n 16 [SD NY 1987].)
It is conceded that actual representation of a corporation, for purposes of DR 7-104 (A) (1) (22 NYCRR 1200.35 [a] [1]), is not accomplished merely by retaining or employing a general counsel for all legal matters. Rather, "[i]n order for the prohibition to apply, the subject matter of the representation needs to have crystallized between the client and the lawyer.” (ABA *364 Formal Opn No. 95-396.) Applying this standard, in order for Outdoor World to have been represented for the purposes of DR 7-104 (A) (1) (22 NYCRR 1200.35 [a] [1]), it must have specifically referred the Meachum-Montanez matter to its counsel.
The January 24, 1994 letter, referred to previously, which was sent from Outdoor World’s legal department to Jack Gross, Esq., an associate at Sedgwick, Detert, Moran & Arnold, counsel for plaintiffs, provides the answer. It specifically states that the Montanez and Peace matters had been forwarded to the office of Bruce Morgan, defendants’ general counsel. The letter is from defendants’ legal department, and sets forth the legal position of the company, expressed by that department on the very issue which prompted the recording of the telephone conversation. While the letter does not reflect whether its author was an attorney, this is irrelevant. The letterhead, on its face, is from Outdoor World’s general counsel, lists Mr. Morgan’s name, and expresses the corporate position on the matter relating to Montanez and Peace’s desires to cancel their memberships.
Outdoor World had previously been contacted by Gross, as counsel for both Peace and Montanez, alleging breach of contract. Under the circumstances, it would be reasonable and probable to expect Gross’ letter to be forwarded to defendants’ attorneys or legal department for review and a response. Clearly, the input and advice of counsel would be expected. In fact, the letter states that the matter had been reviewed by "appropriate” personnel and expressly directs any further inquires to be made to the legal department. Under such circumstances, any attorney, especially one as seasoned as Mr. Kutil purports to be, knew or should have known that, at some time between December 10, 1993 (when Gross wrote to Outdoor World) and January 24, 1994 (when defendant’s legal department responded and directed any further inquiries be made to it), the issue of cancellation of membership was subject to review and advice by counsel to the corporation.
Plainly, applying the criteria of DR 7-104 (A) (1) (22 NYCRR 1200.35 [a] [1]), the subject matter of the representation had crystallized at the time of the January 24,1994 letter, a conclusion which clearly appears from the tenor and language of the correspondence. What remains is whether Kutil had actual knowledge that Outdoor World was represented at the time, or whether such knowledge may be reasonably inferred.
Kutil disclaims knowledge of Outdoor World’s representation at the time of the tape-recorded conversation. He specifi *365 cally denies knowledge that Gross had corresponded with defendants. Montanez states that, while he had knowledge of the January 24th letter to Gross, he had not informed Kutil of the correspondence. Notwithstanding Kutil’s denial of actual knowledge, the circumstances here are such that knowledge may be reasonably inferred. Even assuming that Montanez, after asking Kutil to represent him, did not tell him about the prior correspondence by one of his (Kutil’s) associates, and, assuming further, that Kutil, as a member of the law firm, and a partner, would not be aware of what his associate, Gross, was working on, clearly, copies of the prior correspondence had to have been maintained in the law firm’s file on the matter. Thus, a mere review of the file would have disclosed that both Montanez and Peace had attempted to cancel their contracts and that Gross had advised them to cease making further payments. This knowledge, obtainable from a mere review of the file, should be chargeable to any attorney within the law firm who assumes the responsibility for working on the matter or representing the client. This is especially so in terms of a partner in the position of Mr. Kutil.
The prior correspondence was submitted to this court by Kutil, as exhibits to his affidavit. Plainly, they were retrieved from his office file. The claim that he was not actually told about the letter by Montanez is not dispositive, since an attorney may not properly avoid the ethical bar against communicating with a represented party simply by "closing [his] eyes to the obvious.” (ABA Formal Opn No. 95-396, part IV.) Plainly, either Kutil knew of Gross’ efforts on behalf of the clients, or he should have known and neglected to review his own file on the case.
Not without significance is that, on Montanez’ deposition, when asked whether he had told Kutil about his prior dealings with Gross, Montanez was directed not to answer by Kutil, upon the ground of attorney-client privilege. It needs no citation for the proposition that the privilege may not be interposed as a sword. It exists solely as a shield. Moreover, the transcript of the telephone conversation contains express references to the communication between Outdoor World’s legal department and Gross. In my view, the circumstances here overwhelmingly support an inference of knowledge of representation for the purposes of DR 7-104 (A) (1) (22 NYCRR 1200.35 [a] [1]).
DR 1-102 (A) (2) (22 NYCRR 1200.3 [a] [2]) provides that an attorney shall not, "Circumvent a Disciplinary Rule through the actions of another.” Plainly, an attorney’s client is "anoth *366 er” for purposes of the disciplinary rule. (Committee on Professional and Judicial Ethics of the Association of the Bar of the City of New York, Formal Opn No. 1991-2 [hereinafter NYC Formal Opn No. 1991-2].) While there is no precise definition to be given to the terms "causing another to act” or "circumvention,” resolution of the issue "requires an ad hoc determination based upon the facts of each particular case.” (Miano v AC & R Adv., 148 FRD, supra, at 82.) As was observed in Miano, "[o]bviously, when an attorney actually requests or engineers a contact or action by another that would otherwise be prohibited by the disciplinary rules, he or she can be deemed to have 'caused’ it and to have 'circumvented’ the rule. An attorney cannot legitimately delegate to another what he himself is prohibited from doing”. (Supra.)
Clearly, clients have the right to deal with each other directly. While an attorney does not have the duty to dissuade, deter or discourage a client’s action (see, ABA Formal Opn No. 84-350), counsel may not ethically "recommend or endorse” such action. (Miano v AC & R Adv., supra, at 83.) Even if a client first raises or proposes communication with an adverse party, a lawyer may still be deemed to have caused the communication by " 'observing or advising that it might be desirable for the client to * * * speak to the adverse party, if the lawyer’s action is a material factor in the client’s final decision to engage in such a communication.’ ” (Miano v AC & R Adv., supra, at 82, quoting NYC Formal Opn No. 1991-2, at 7.)[6]
Plaintiffs contend that, under New York law, the tape-recording of a conversation is legal if consented to by one of the parties to the conversation. This, however, is not dispositive. While the tape-recording may not have been illegal, nevertheless, the conduct by counsel was unethical and highly improper. Had Montanez thought of the idea on his own and merely sought Kutil’s advice as to its legality, the contention might have some relevance. (See, Miano v AC & R Adv., supra, at 83.) An attorney "need not discourage or deter such activity, but he also may not assist, direct or otherwise participate in it so that, in effect, he is using the client as a vehicle to do what he cannot do.” (Miano v AC & R Adv., supra, at 83, citing NYC Formal Opn No. 1991-2, at 7.) In this connection, the New *367 York City Bar Association Commission on Professional and Judicial Ethics, in Formal Opinion No. 80-95 (hereinafter NYC Formal Opn No. 80-95), opines that the secret recording of conversations by attorneys is generally improper under DR 1-102 (A) (4) (22 NYCRR 1200.3 [a] [4]), which prohibits conduct involving "dishonesty, fraud, deceit, or misrepresentation.” (See also, NYC Formal Opn No. 1995-10 [concluding that attorneys may not ethically record telephone or personal conversations with opposing counsel without first advising of the intention to record].)
As far as applicable here, Montanez admits that the taping was Kutil’s idea and that Mr. Kutil dialed the number and listened to the conversation without acknowledging his presence. Furthermore, the recording took place in his office and on equipment furnished by the law firm. It is clear on this record that counsel "engineered” the tape-recording, an orchestration which should suffice to deem the action as having been "caused” by the attorney. (Miano v AC & R Adv., supra, at 82.) Moreover, the admitted purpose for the recording — to fortify allegations to be made in the complaint, at a time when attorneys were on the scene for both sides — supports the finding of impropriety. What was done by counsel here was violative of the Code of Professional Responsibility. It was highly improper and, in my view, amounted to sharp, if not unethical practice.
(B) Naomi Taylor’s Trip to Outdoor World’s Timothy Lake Campground.
On November 4, 1995, Naomi Taylor, the mother of one of the class attorneys, Jay Taylor, traveled to Outdoor World’s Timothy Lake campground, for a free weekend stay. She sat through a sales presentation and, after the weekend, decided that an Outdoor World membership was not for her. Defendants allege a violation of DR 7-104 (A) (1) (22 NYCRR 1200.35 [a] [1]), claiming that Mrs. Taylor’s trip was an unauthorized contact with a represented party. Defendants also contend that Mrs. Taylor was acting as a representative or agent of her son and, therefore, was barred from such contact by the DR 7-104 (A) (1) (22 NYCRR 1200.35 [a] [1]) prohibition against causing someone else to communicate with a represented party.
In the main, this action is premised upon alleged misrepresentations by employees of Outdoor World as to memberships and the benefits to be accorded to members. The action seeks to hold defendants accountable for false representations made by employees and, in that connection, it is claimed that all *368 Outdoor World employees receive the same training and, essentially, made the same or substantially similar false representations to members of the class.
Under the standard adopted by the Court of Appeals in Niesig v Team I (76 NY2d, supra, at 374), corporate employees whose acts or omissions may be imputed to the corporation for purposes of its liability are "parties” within the scope of the disciplinary rule. Although the specific employees with whom Mrs. Taylor spoke are unnamed, their identity is not a critical consideration in terms of whether they are "parties” for purposes of the application of the rule. Presumably, these are the very same employees, or similar to those who made representations to or exerted pressure upon plaintiffs and other members of the class.
Prior to her trip to Timothy Lake, Mrs. Taylor was aware of her son’s involvement with the class action against Outdoor World. The transcript of her deposition states she was aware of this a few days before she left, her son having told her that he was representing several plaintiffs in a class suit against Outdoor World. Furthermore, at the time of his mother’s trip to Timothy Lake, on November 3, 1995, Mr. Taylor was aware that Outdoor World was a represented party. Could he have any doubt, especially in view of the allegations made by him in this litigation, that his mother would not be subjected to the very same sales presentations and pressure which form the basis of this lawsuit. Nevertheless, he did not ask his mother not to go, nor did he seem concerned that such an arrangement might be ethically suspicious. Such indifference to a potentially unethical appearance is contrary to the stricture contained in Code of Professional Responsibility EC 9-6, "to strive to avoid not only professional impropriety but also the appearance of impropriety.”
Notwithstanding the foregoing, there is no evidence in the record that Mrs. Taylor was sent to Outdoor World by her son. While Mr. Taylor’s conduct may be questionable, defendants have not established that counsel was the impetus underlying Naomi Taylor’s trip to Timothy Lake. Consequently, although counsel could have and should have acted with prudence to have avoided the situation, I do not find what occurred here sufficient to constitute a violation of DR 7-104 (A) (1) (22 NYCRR 1200.35 [a] [1]). As far as appears, this was a situation of one not an attorney, acting on her own and not as agent or alter ego of the attorney. Therefore, the trip by Naomi Taylor to Timothy Lake, and her conversation with defendants’ em *369 ployees, have no bearing upon the issue of class action certification on this record.
(C) Did Naomi Taylor Engage in Precertification Solicitation?
While it is found that Mrs. Taylor’s trip to Outdoor World was not violative of any disciplinary rule, it is contended that, subsequently, she improperly solicited Rosalina Torondek as a member of the class. Solicitation of clients for the commencement or continuation of a class action is improper, sufficient to warrant denial of class action certification.
In our case, it is undisputed that, in November 1995, Naomi Taylor took a trip to Outdoor World’s Timothy Lake campground, after having been offered a free weekend by her friend, Rosalina Torondek. It is also undisputed that she returned without having purchased a membership.
The record is not at all clear, however, how Ms. Torondek became aware of Jay Taylor’s involvement in the case. Discrepancies abound between her account and that of Mrs. Taylor. Naomi Taylor swore that she called Ms. Torondek, told her about her experience at Timothy Lake and, after Ms. Torondek told her about problems making reservations, she told Torondek that her son was representing certain plaintiffs in a class action against Outdoor World.
Ms. Torondek’s recollection of the events differs in material respects. She recalled that it was she who called Taylor after the weekend. However, nothing was said in that conversation about Mr. Taylor’s representation of plaintiffs in a class action. Rather, according to Torondek, she was told about Jay Taylor’s involvement during a subsequent conversation. Torondek claims she did not mention any problems as to reservations before or after the trip; rather, she told Mrs. Taylor that she couldn’t afford the membership and the latter "referred” her to her son.
It is plain that the inconsistency in the sworn statements calls into question the credibility of Mrs. Taylor. Although one might argue that it is possible that Mr. Taylor may have instructed his mother to "inform” Ms. Torondek of his representation, plausibility alone does not rise to the level of solicitation, sufficient to deny class action certification. (See, Cannon v Equitable Life Assur. Socy., 106 Misc 2d, supra, at 1069.) Moreover, aside from the foregoing, it is conceivable here that Mrs. Taylor acted in her friend’s best interest, not necessarily to gain a pecuniary advantage for her son. Therefore, not only is there insufficient evidence to support defendants’ contention *370 that Mrs. Taylor engaged in precertification solicitation, at her son’s request, even had that been proved, which it was not, the relationship between Mrs. Taylor and Ms. Torondek could operate as a bar to a finding of improper behavior in any event.
II. Plaintiffs’ Relationship to Counsel
Defendants contend that the employment relationship of the plaintiffs to the law firm which represents them, Sedgwick, Detert, Moran & Arnold (Meachum and Montanez continue to be employees of and Mrs. Peace had been an employee of the law firm), is sufficient ground to deny class action certification. It is claimed that they lack the independence to adequately and fairly represent the class.
The potential conflict of interest which arises out of class representatives, who have employment or familial relationships with class counsel, has been the subject of several reported decisions. (See, Tanzer v Turbodyne Corp., 68 AD2d 614; Viders v Pennsylvania Handicapped Workers, 90 Misc 2d 579; see also, Susman v Lincoln Am. Corp., 561 F2d 86, supra; Brick v CPC Intl., 547 F2d 185 [2d Cir 1976].) It has been recognized that legal fees have been a prime motivation for the filing of class actions (Kramer v Scientific Control Corp., 534 F2d 1085, 1090-1091 [3d Cir 1976]). In most cases, the financial benefit to counsel far exceeds the individual benefit to class members. Therefore, independence from counsel is imperative, since "[a]n obvious function of the class action representative is to act as a check on the attorneys, as an additional assurance that in any settlement or other disposition the interests of the members of the class will take precedence over those of the attorneys. This would seem to require that the class representative shall have some measure of independence from the attorneys, or at least not be the alter ego of the attorneys.” (Tanzer v Turbodyne Corp., supra, at 620.) Lack of independence of the class representative from counsel increases the potential for impropriety, since, "[i]n any class action there is always the temptation for the attorney for the class to recommend settlement on terms less favorable to his clients because a large fee is part of the bargain.” (Graybeal v American Sav. & Loan Assn., 59 FRD 7, 13 [DC 1973].) There is a further danger which may result from a class representative who is not independent in terms of safeguarding the best interests of absent class members.
The most obvious example of a lack of independence between plaintiff and class counsel is when the two are one and the *371 same. The conflict inherent in this "dual relationship” is obvious, since, in such case, plaintiff, as a class member, stands little to gain in his representative capacity, but stands to gain a great deal as counsel. (See, Graybeal v American Sav. & Loan Assn., supra, at 14; see also, Cotchett v Avis Rent A Car Sys., 56 FRD 549, 554 [SD NY 1972]; Shields v Valley Natl. Bank, 56 FRD 448 [Ariz 1972].) Inasmuch as due process ensures that the rights of potential class members be protected, as a general proposition, a class representative should not be permitted to also act as counsel to the class.[7]
Similarly, it has been held that a conflict of interest exists when the class representative is a partner or associate of the law firm which represents the class. (See, Susman v Lincoln Am. Corp., 561 F2d 86, supra; Brick v CPC Intl., 547 F2d 185, supra; Turoff v May Co., 531 F2d 1357 [6th Cir 1976]; In re AM Intl. Sec. Litig. v Ash, 108 FRD 190, 197-198; Cotchett v Avis Rent A Car Sys., 56 FRD 549, supra.) In Turoff, three of the four named plaintiffs were attorneys with the law firm which appeared as counsel to the class and the fourth was the wife of one of them. The court affirmed the denial of class certification, holding that "an inherent conflict” existed for the same individual to attempt to represent the class as plaintiff and as counsel. (Turoff v May Co., 531 F2d, supra, at 1360.) As was aptly observed: "If the interests of a class are to be fairly and adequately protected, if the courts and the public are to be free of manufactured litigation, and if proceedings are to be without cloud, the roles of class representative and of class attorney cannot be played by the same person.” (Supra.)
Although some courts have adopted a per se rule to prohibit dual appearance in such situations, in terms of Federal authorities, it does not appear that the Second Circuit has done so. As far as appears, the issue is a matter within the court’s discretion. (See, In re AM Intl. Sec. Litig. v Ash, 108 FRD 190, supra; see also, Brick v CPC Intl., 547 F2d 185, supra.) Thus, disposition of the issue is on a case-by-case basis, which, more appropriately, gives effect to ethical considerations embraced by the frequently cited proposition that attorneys should avoid even the appearance of professional impropriety. (See, Kramer v Scientific Control Corp., 534 F2d, supra, at 1091-1092, cert *372 denied sub nom. Andersen & Co. v Kramer, 429 US 830; ABA Canon of Professional Ethics No. 9.)
Where there is a close relationship between class representatives and class counsel, the reported decisions reflect a divergence in opinion, albeit there is a real and legitimate concern for ethical considerations. Thus, in Stull v Pool (63 FRD 702, 704 [SD NY 1974]), the court held that the wife of a partner in the law firm which appeared as counsel to the class was not an appropriate representative, since her potential recovery as a member of the class was dwarfed by the financial interest which she and her husband, as a marital unit, might have in the legal fees which could result. (Citing Cotchett v Avis Rent A Car Sys., 56 FRD 549, supra.) Similarly, in Viders v Pennsylvania Handicapped Workers (90 Misc 2d 579, supra) the court precluded a woman from appearing as class representative because her husband was a partner in the law firm which was counsel to the class. (See also, Dennis v Saks & Co., 20 Fed R Serv 2d 994, 998 [SD NY 1975].)
In Tanzer v Turbodyne Corp. (68 AD2d 614, supra), the class representatives were closely related to the attorneys for the class. In denying class action treatment, the Appellate Division, First Department, noted that the representatives, as a regular practice, had made numerous small investments to position themselves to bring lawsuits through the law firm, and further, their interest in the lawsuit was "substantially outweighed by the possibility of benefit to the law firm to which they are so closely related.” (Supra, at 621.) In denying certification in that case, Justice Silverman observed: "Granted that the law firm is well known for its abilities and energy in stockholders’ litigation, I think the totality of the circumstances raises so severe a cloud, on at least the appearance of these class representatives being able to protect the interests of the class through these attorneys, that the class should not be certified. If persons who have not affirmatively consented to the lawsuit are to be affected by the lawsuit, the proceedings should be 'without cloud.’ (Turoff v May Co., supra, p 1360.)” (Tanzer v Turbodyne Corp., 68 AD2d, supra, at 621; see also, Kriger v European Health Spa, 56 FRD 104 [ED Wis 1972].)
Plaintiffs rely upon Mautner v Hirsch (831 F Supp 1058 [SD NY 1993]); Sweet v Bermingham (65 FRD 551 [SD NY 1975]); and Fischer v International Tel. & Tel. Corp. (72 FRD 170 [ED NY 1976]) in support of their contention that the class representatives are sufficiently independent of class counsel to fairly and adequately represent the class.
*373 Reliance upon those cases, however, is misplaced. In the first place, each of those decisions concerns an attorney with a familial relationship to the plaintiff. In our case, however, the situation involves an employment relationship, far more analogous to those situations involving plaintiffs who are partners or associates with the law firm which appeared as counsel to the class.
More importantly, both Mautner (supra) and Sweet (supra) were shareholder derivative actions. Judge Conner in Mautner, and Judge Cannella in Sweet, distinguished the usual rule which applies in class actions upon that basis. This follows naturally from the difference in the nature of the relief sought in a derivative action, where the real party in interest is the corporation, on whose behalf a recovery is sought. Thus, derivative actions do not réquire judicial authorization for their commencement, as is the prevailing rule with class actions. In both Mautner and Sweet, the court agreed with the rule which persists in class actions, but held that it was inapplicable to derivative suits. Thus, plaintiffs’ reliance upon those decisions is misplaced.
While Fischer (supra) concerned a class action, wherein the plaintiff, as class representative, was the father of the attorney for the class, as noted, cases involving familial relationships are different from those where the plaintiff may have an interest in the legal fees to be recovered by the attorneys representing the class. This was noted by Judge Platt in Fischer as "the touchstone for denial of class action status” (Fischer v International Tel. & Tel. Corp., 72 FRD, supra, at 173).
In the within action, one of each of plaintiff couples has or had a long-standing employment relationship with the law firm which represents the class, a situation which, in my view, poses an inherent conflict of interest. A similar situation was addressed in Sommers v Abraham Lincoln Fed. Sav. & Loan Assn. (66 FRD 581 [ED Pa 1975]), wherein the court found that a serious conflict was present by the fact that one of each of the five original plaintiff couples was employed by the law firm who had appeared as class counsel. The District Court found such a situation "analogous to that of the plaintiff who is, or is a partner or spouse of, plaintiff’s counsel”, an inadequacy which the Sommers court held had been cured in that case "by the intervention of numerous other named plaintiffs.” (Supra, at 589.)
Concededly, there has been no such large scale intervention to alleviate the conflict in this case. The interrelationship of *374 class plaintiffs and counsel, the employer (or former employer) of one of each of plaintiff couples, is apparent, as is the control which may be exerted. Both Montanez and Meachum receive their family incomes from the law firm which represents the class. Both have a substantial financial interest in the continued success of the firm, not directly as a profit-sharing partner or associate, but rather, through their respective incomes and through the enhancement of the reputation and good will of the law firm, which would accompany a large award for counsel fees. (See, Susman v Lincoln Am. Corp., 561 F2d, supra, at 94.)
In my view, the potential conflict of interest which emanates from the employment relationship between plaintiffs and counsel is clear. In addition to the financial interest, there is a degree of control and dependence which poses a further conflict. While counsel claims that the class representatives have no actual interest in any counsel fees which may result, there is an appearance of impropriety here which must be excised. The totality of the circumstances, including the complicity of certain of the plaintiffs in the improper and unethical tape-recording of a conversation with one of defendants’ supervisory employees, has cast a dark cloud upon the proposed representation of the class-by-class counsel. This, in my view, may be alleviated only by removing the appearance of impropriety, which will persist as long as the litigation continues under the control of present counsel for the class.
CONCLUSION
In this case, most of the critical factors for class action treatment have been satisfied. The pleadings raise substantial issues. On the surface, these present a widespread practice of fraud and deception, which could affect a significant number of New York residents. The class is sufficiently numerous that joinder of all members is impracticable and there are common questions of law and fact, which predominate over questions affecting only individual members. Bearing in mind the nature and substance of the issues, a class action is clearly superior to other available measures for the fair and efficient adjudication of the controversy.
Nevertheless, for the reasons discussed, in particular, the ethical considerations, I do not find that the representative parties, through present counsel, will fairly and adequately protect the interests of the class. The relationship of the class representatives and counsel, as present and former employees, and the degree of control which may be exercised, are inimical *375 to according class action treatment, with these attorneys representing the class. Although, even if one considers this relationship, standing alone, to be insufficient to warrant denial of class action status, the palpably improper and unethical conduct by counsel, in surreptitiously tape-recording the telephone conversation with defendants’ supervisory employee, at a time when counsel knew or should have known that the corporation was represented by or acting through its attorneys (or legal department) was improper and unethical. It was deceptive, most unprofessional and demonstrates a lack of judgment, sufficient to hold, as a matter of law, that counsel is unfit to proceed further in the proper representation of the class in this action.
Accordingly, upon the foregoing, the motion for class action certification is denied, without prejudice to further proceedings and/or renewal by plaintiffs and other potential class members, when and if different attorneys are secured or retained to represent the putative class. The videotape exhibits, which had been submitted on the motion, may be retrieved from chambers.
[Portions of opinion omitted for purposes of publication.]

. In Kronenberg v Hotel Governor Clinton (281 F Supp 622, 626 [SD NY 1967), the court would not deny the class protection due to an improper communication by class counsel, since the motion to dismiss was made at the time the Statute of Limitations was about to expire.

. In Halverson v Convenient Food Mart (458 F2d 927, 930), it was found that a lawyer who had, in effect, represented and benefitted every franchisee *359 of a grocery store, by negotiating for restitution on their behalf, could reasonably believe each franchisee was a client.

. The attorney accused of misconduct withdrew from the case and the appellate court considered the District Court’s statements on that issue only to the point that it felt notice and a hearing should have been given prior to condemnation of his conduct. (See, Korn v Franchard Corp., 456 F2d, supra, at 1208, n 4, and accompanying text.)

. The Halverson court observed that if misconduct did not rise to the "egregious” level, disciplinary action would be the ordinary remedy. (Halverson v Convenient Food Mart, 458 F2d, supra, at 932.)

. The five-part test promulgated by the Cole court shares with Niesig (supra) the prohibition of communication with those employees who (1) may impute liability to the corporation, (2) implement the advice of counsel, (3) have their own interests at stake, or (4) have a managerial responsibility. The fifth class concerns statements made within the scope of employment, expressly rejected by Niesig because of reliance upon rule 801 (d) (2) (D) of the Federal Rules of Evidence. But, as in Niesig, the fifth part would permit ex parte contacts with "mere witnesses” to an event. (Cole v Appalachin Power Co., 903 F Supp, supra, at 979.)

. The Committee suggested that, in determining whether the attorney’s acts or words were material to the client’s decision, the focus should be on whether those words or acts would reasonably be understood to suggest or encourage that the client should engage in such communications. (Miano v AC & R Adv., supra, at 82, citing NYC Formal Opn No. 1991-2, at 7, n 4.)

. But see, Susman v Lincoln Am. Corp. (561 F2d, supra, at 90, n 5, citing Clark v Cameron-Brown Co., 72 FRD 48 [MD NC 1976]), where an individual was permitted to act as class representative and class counsel. The court, however, condoned the arrangement only because other class representatives existed.