OPINION OF THE COURT
Philip J. Patti, J.
Introduction
This case raises an important ethical issue: when, if ever, may a claimant’s attorney or his agent conduct ex parte interviews of key fact witnesses employed by the State of New York?
*501 Facts
On June 25, 1996, claimant[1] was involved in a serious collision with a tractor trailer at the intersection of Lockport Road and State Route 425 (Shawnee Road) in the Town of Wheat-field. Concluding that the accident was caused by a misaligned traffic signal, claimant and his wife, through their attorney, served a notice of intention, which the New York State Attorney General received on September 18, 1996.
When it received the notice of intention, the Attorney General’s Office opened a file and assigned the matter to Mr. Thomas C. Fenton, a Law Department investigator, who apparently undertook some preliminary review of the matter. He contacted Department of Transportation (DOT) Region 5 to determine the names of potential witnesses and spoke to a DOT supervisor named Craig Walek. He also prepared a letter, dated October 29, 1996, and a memorandum, dated October 31, 1996, regarding this potential claim.[2]
During the same period of time, claimants’ attorney conducted his own investigation. He obtained documents from the DOT which revealed that a DOT crew had repaired and adjusted the traffic signal in question within 24 hours prior to the accident. He also hired a private investigator named Mr. William Clark. It is Mr. Clark’s activities that are the subject matter of defendant’s motion.
On May 16, 1998, Mr. Clark interviewed Gary Cawthard, Joseph Kaleta and Peter Kasperek, the three DOT employees who worked on the traffic signal just before claimant’s accident. On May 21, 1998, Mr. Clark also interviewed John Dugan, a DOT employee who was apparently responsible for supervising Messrs. Cawthard, Kaleta and Kasperek. Mr. Clark conducted each of the interviews without the prior knowledge or permission of the Attorney General and tape recorded the interviews without the consent of the witnesses.
Claimants filed their claim on June 8, 1998, about two weeks after Mr. Clark completed his interviews. The Attorney General received service of the claim on June 11, 1998. The controversy that led to this motion arose in October 1998, when claimants’ attorney responded to defendant’s demand for state- *502 merits by producing transcribed copies of Mr. Clark’s interviews and served a notice to take the depositions of the four employee witnesses.
Defendant concedes that there was nothing illegal about the surreptitious tape recording of the interviews. It contends, however, that claimants’ attorney violated Code of Professional Responsibility DR 7-104 (A) (1) (22 NYCRR 1200.35 [a] [1]) because he let his investigator communicate directly with the employee witnesses about the case. Defendant asks the court to (1) suppress the statements; (2) preclude claimants from using the testimony of the employee witnesses; (3) grant a protective order preventing claimants from taking the depositions of these witnesses; and (4) disqualify claimants’ attorney from representing claimants in this case. For the reasons stated below, I am denying defendant’s motion in its entirety.
Discussion
The starting point in this analysis is DR 7-104, which provides in pertinent part as follows:
“(A) During the course of the representation of a client a lawyer shall not:
“(1) Communicate or cause another to communicate on the subject of the representation with a party the lawyer knows to be represented by a lawyer in that matter unless the lawyer has the prior consent of the lawyer representing such other party or is authorized by law to do so.” (Code of Professional Responsibility DR 7-104 [22 NYCRR 1200.35].)
There is no question that claimants’ attorney “caused” Investigator Clark to interview the employee witnesses, or that Mr. Clark and the witnesses discussed the “subject” of this case. Claimants’ attorney freely admits that he directed Mr. Clark to interview the employees about their activities to confirm that the claim he anticipated filing would not be frivolous. Claimants’ attorney also agrees that he would be ethically responsible if the interviews were improper, even though it was Mr. Clark who actually conducted them (see, Code of Professional Responsibility DR 7-104 [22 NYCRR 1200.35]; see also, ABA Comm on Ethics and Professional Responsibility Opn No. 95-396, at 20-21 [1995]).
Therefore, evaluating whether claimants’ attorney violated DR 7-104 hinges on three issues: (1) whether the employee witnesses were “parties”; (2) whether they were “represented by a lawyer” at the time of the interviews; and (3) whether claimants’ attorney “knew” that the employee witnesses were represented by a lawyer at that time.
*503 1. Were The Employee Witnesses “Parties”?
The question of who should, or should not, be considered a “party” for purposes of DR 7-104 is controlled by Niesig v Team I (76 NY2d 363). There, the Court of Appeals held that the term “party,” when applied to an entity such as a corporation, should include only those employees and agents whose conduct could “bind” the entity or who were directly involved in working on the matter with legal counsel: “The test that best balances the competing interests * * * is one that defines ‘party to include corporate employees whose acts or omissions in the matter under inquiry are binding on the corporation (in effect, the corporation’s ‘alter egos’) or imputed to the corporation for purposes of its liability, or employees implementing the advice of counsel. All other employees may be interviewed informally.” (Niesig v Team I, supra, at 374.)
Judge John P. Lane of this court has held, and I agree, that Niesig (supra) applies with the same force to employees of the State of New York as it does to persons who are employed by private corporations (see, Gilbert v State of New York, 174 Misc 2d 142; see also, Harris v State of New York, Ct Cl, Mar. 19, 1999, Corbett, J., claim No. 95287, motion No. M-58623).
Judge Lane’s decision in Gilbert (supra) is instructive; but it is also distinguishable. In that case, a DOT employee gave an ex parte interview to the claimant’s attorney in which he corroborated the claimant’s allegations of negligent snow removal. The employee in question claimed to have observed the dangerous highway condition and reported it, but had no responsibility for creating the dangerous condition or for remedying it. Judge Lane concluded that the employee was not a “party’ for purposes of DR 7-104, because his acts and omissions could not “bind” the State for purposes of liability.[3]
I agree with defendant that the employee witnesses interviewed by Mr. Clark played a different role than the DOT employee who was interviewed by counsel in Gilbert (supra). I also agree that these employee witnesses should be treated as “parties” under Niesig (supra). The acts and omissions of the employee witnesses in this case, unlike the DOT employee in Gilbert, may directly affect defendant’s liability to claimants. Claimants’ central theory in this case is that Messrs. Cawthard, Kaleta and Kasperek did not properly repair the traffic *504 signal and that Mr. Dugan did not adequately supervise them. If claimants are correct, then there is a strong likelihood that the employees’ negligence will be “imputed to the [State] for purposes of its liability” (Niesig v Team 1,76 NY2d 363, 374, supra; Foley v State of New York, 294 NY 275). Therefore, the employee witnesses are parties under Niesig.
2. Were The Employee Witnesses “Represented By Counsel”?
The conclusion that the witnesses are parties does not, of course, end the inquiry. I must also decide whether the employees were “represented by counsel” and whether claimants’ attorney “knew” about the representation (Code of Professional Responsibility DR 7-104 [A] [1] [22 NYCRR 1200.35 (a) (1)]) at the time of the interviews.
An entity cannot claim a blanket protection from ex parte interviews by taking the position that house counsel is responsible for all future legal matters affecting that entity (see, ABA Comm on Ethics and Professional Responsibility Opn No. 95-396, at 14-15 [1995]). Something must transpire before an attorney-client relationship arises and the requirements of DR 7-104 come into play. What that “something” might be was not an issue that was squarely addressed by Niesig (supra) or by Gilbert (supra).
Relying upon a decision of the Supreme Court, Queens County, defendant argues that an attorney-client relationship arises, and the prohibition of DR 7-104 begins to apply, when “the subject matter of the representation [has] crystallized between the client and the lawyer” (defendant’s affirmation 17, citing Meachum v Outdoor World Corp., 171 Misc 2d 354, 363, citing ABA Comm on Ethics and Professional Responsibility Opn No. 95-396 [1995]). Clearly, a lawsuit does not have to be filed before DR 7-104 (A) (1) applies; if that were the case, then the rule would apply only to lawsuits, and not to the broad range of nonlitigation services that lawyers provide to their clients.[4]
In Meachum (supra), the court concluded that a law firm violated DR 7-104 when one of its attorneys listened in on a call made by a would-be class plaintiff to an employee of Outdoor World, the expected defendant. No complaint had been filed in the matter at the time of the call. However, Outdoor *505 World’s legal counsel had already asked plaintiffs counsel to direct all future inquiries to his attention. The court concluded that an attorney-client relationship formed and the prohibition of DR 7-104 began to apply when the matter was “specifically referred” to Outdoor World’s counsel by Outdoor World’s management (Meachum v Outdoor World Corp., 171 Misc 2d 354, 364, supra).
Relying on Meachum {supra), defendant argues that the prohibition of DR 7-104 attached when claimants “referred” the matter to the Attorney General by serving a notice of intention in September 1996. Claimants respond that the Attorney General’s position would make it virtually impossible for claimants to conduct a meaningful investigation before bringing a claim. Claimants argue that there must be some sort of direct communication between the affected employee witnesses and an agent of the Attorney General before an attorney-client relationship may arise. Since there is no evidence of such communication in this case, claimants’ attorney argues that his actions were proper.
On reflection, I conclude that claimants’ position is correct because it is in harmony with the Court of Appeals reasoning in Niesig {supra).
In Niesig (supra), the party opposing ex parte interviews asked the Court of Appeals to adopt a bright-line rule that would bar opposing counsel from conducting ex parte interviews of any employee of a represented corporation. The Court recognized that corporate defendants had a substantial interest in preventing such interviews to safeguard themselves from “improvident settlements, ill-advised disclosures and unwarranted concessions” (Niesig v Team I, 76 NY2d 363, 370, supra). It also acknowledged that “every rule short of the absolute poses practical difficulties as to * * * which employees fall on either side of it” (at 373). Nevertheless, the Court concluded that a broad prohibition would unduly compromise “the values served by permitting access to relevant information” (Niesig v Team I, 76 NY2d 363, 373, supra): “[T]he * * * blanket rule closes off avenues of informal discovery of information that may serve both the litigants and the entire justice system by uncovering relevant facts, thus promoting the expeditious resolution of disputes. Foreclosing all direct, informal interviews of employees of the corporate party unnecessarily sacrifices the long-recognized potential value of such sessions. ‘A lawyer talks to a witness to ascertain what, if any, information the witness may have relevant to his theory of the case, and to *506 explore the witness’ knowledge, memory and opinion— frequently in light of information counsel may have developed from other sources * * *’ Costly formal depositions that may deter litigants with limited resources, or even somewhat less formal and costly interviews attended by adversary counsel, are no substitute for such off-the-record private efforts to learn and assemble, rather than perpetuate, information.” (Niesig v Team I, supra, at 372.)
If I were to hold, as the State urges here, that the mere service of a notice of intention upon the Attorney General necessarily terminates a claimant’s right to conduct ex parte interviews, I would be jeopardizing the very “values” that the Court of Appeals found to be compelling in Niesig (supra). Ex parte interviews advance important interests in all actions, but they are particularly important in actions brought against the State. Persons who wish to sue the State for torts or for wrongful death have an exceedingly brief period of time — only 90 days — to file and serve a claim or serve a notice of intention (see, Court of Claims Act § 10). When they file their claims, they must comply with very stringent pleading requirements (see, Cobin v State of New York, 234 AD2d 498, Iv dismissed 90 NY2d 925; Court of Claims Act § 11). A claim that does not meet those requirements may be found to be “jurisdictionally defective,” in which case the claimant may be barred forever from asserting it (see, e.g., Schneider v State of New York, 234 AD2d 357). Thus, claimants have a compelling interest in being allowed to conduct informal discovery to the extent that it is possible to do so without compromising the interests that DR 7-104 is designed to protect.
The policies that underpin DR 7-104 (A) (1) are not compromised when, as here, opposing counsel conducts ex parte interviews of relatively low-level State employees who have not yet spoken to one of the Attorney General’s assistants or investigators. These witnesses cannot make “unwarranted concessions.” As Judge Lane noted in Gilbert, out-of-court statements made by such employees are not binding upon the State as admissions because the making of such statements is not an activity within the scope of the employees’ authority (Gilbert v State of New York, 174 Misc 2d 142, 147-148, supra; see also, Loschiavo v Port Auth., 58 NY2d 1040, 1041; Kelly v Diesel Constr. Div., 35 NY2d 1, 7-8). Nor do such employees have actual or apparent authority to enter into settlements— improvident or otherwise — since the authority to compromise claims rests with the Commissioner of the Department of *507 Transportation or another “duly authorized officer or employee” of the Department (see, Transportation Law § 14 [14]; see also, White v United States Dept. of Interior, 639 F Supp 82, 90 [MD Pa 1986], affd 815 F2d 697 [3d Cir 1987] [holding that parties who deal with a Government agent are generally charged with notice of the limits of the agent’s authority]).
There is also no significant risk that employees like the ones who were interviewed here will disclose information protected by the attorney-client privilege or the attorney work-product privilege. Given the nature of their jobs, it is exceedingly unlikely that they would be privy to such information until they have communicated with an agent of the Attorney General about the case. In such circumstances, the only “ill-advised disclosures” they are likely to make would relate to factual issues. While the Attorney General, like any good advocate, would want to keep damaging factual information out of the hands of his adversary for as long as possible, preventing disclosure of factual information was clearly not the Court of Appeals primary concern in Niesig (Niesig v Team I, 76 NY2d 363, 375, supra [concluding that it “would clearly permit direct access to employees who were merely witnesses to an event for which the corporate employer is sued” (emphasis added)]; see also, Gilbert v State of New York, 174 Misc 2d 142, 143, supra [denying suppression of a “very damaging” statement by a DOT employee witness which contradicted the information provided by the other DOT witnesses to the Attorney General through formal discovery]).
Having balanced the claimants’ need for quick, informal discovery against the policies that underlie DR 7-104 (A) (1), I conclude that the serving of the notice of intention, by itself, was not enough to trigger the restrictions of DR 7-104 in this case. Claimants’ attorneys were free to speak to relatively lower-level employees like the ones who were interviewed here, at least until the Attorney General or one of his agents actually spoke to or corresponded with those employees or provided them with privileged information about the subject matter of the case. Since there is no proof that these witnesses communicated with the Attorney General before claimants’ investigator interviewed them, I hold that the employee witnesses were not “represented by a lawyer” when they were interviewed in May 1998.
3. Did Claimants’ Attorney Know Of Any Representation?
Even if I were to conclude that the steps taken by the State before May 1998 established an attorney-client relationship be *508 tween the employee witnesses and the Attorney General for purposes of DR 7-104, I would nevertheless be compelled to deny the State’s motion, because it is not clear that claimants’ attorney “knew”, in May 1998 that the employee witnesses were represented by the Attorney General. No attempt was ever made to advise claimants’ attorney of the Attorney General’s role in the case or to ask him to refrain from communicating directly with the employee witnesses. Thus, this matter is readily distinguishable from the Meachum case, where counsel for Outdoor World wrote to the would-be plaintiffs attorneys and made such a request (see, Meachum v Outdoor World Corp., 171 Misc 2d 354, supra).
Nevertheless, the Attorney General argues that such communication was unnecessary. The Attorney General claims that its involvement in the case was a foregone conclusion which claimants’ attorney could not avoid “simply by closing his eyes to the obvious” (Ramsay affidavit 18, citing Meachum v Outdoor World Corp., 171 Misc 2d 354, 365, supra; see also, ABA Comm on Ethics and Professional Responsibility Opn No. 95-396 [1995]).
I agree that it was apparent that the Attorney General would eventually represent the State and the employee witnesses in this case. Indeed, it is the Attorney General’s statutory duty to represent the State in all actions and proceedings in which the State is interested — even when the State’s primary defense is handled by private counsel (Executive Law §§ 62, 67). I disagree, however, that claimants’ attorney “knew” in May 1998 that such representation had actually begun. Claimants’ attorney averred that it was his understanding, based upon his prior dealings with Assistant Attorneys General, that the Attorney General’s Office normally does not prepare to defend a potential lawsuit until a claim has been filed.
The impression held by claimants’ counsel was a reasonable one. It was one that the Attorney General’s Office could have easily dispelled, if it had wanted to, by sending a letter to claimants’ attorney at the address that appeared on the notice of intention. The fact that the Attorney General did not contact claimants’ attorney regarding this matter in the nearly two-year period after service of the notice of intention made it reasonable for claimants’ attorney to conclude that no attorney-client relationship had “crystallized” and that DR 7-104 did not apply.
In reaching this conclusion, I am relying, in part, upon the commentary and history of rule 4.2 of the Model Rules of *509 Professional Conduct, a rule that was taken virtually verbatim from DR 7-104 (see, 2 Hazard, The Law of Lawyering § 4.2:101 [2d ed]). By their terms, both rules prohibit contact with a represented party where the attorney actually “knows” of a representation. Neither rule expressly forbids such contact, however, where the attorney “reasonably should know” that the witness was represented (see, Model Rules of Professional Conduct rule 4.2; DR 7-104 [A] [1] [22 NYCRR 1200.35 [a] [1]). Thus, these rules have been construed to apply only when the attorney has actual knowledge that the witness is represented (ABA Comm on Ethics and Professional Responsibility Opn No. 95-396, at 13 [1995]; see, Model Rules of Professional Conduct rule 4.2, comment 5). While an attorney’s actual knowledge may often be inferred from the circumstances (see, Model Rules of Professional Conduct rule 4.2, comment 5), the credible explanation offered by claimants’ counsel satisfied me that he did not “know” in May 1998 that the Attorney General had begun to represent the employee witnesses.
Conclusion
For the reasons stated above, I deny defendant’s motion in its entirety.

. Unless otherwise indicated, all references to claimant refer to Scott M. Schmidt.

. It is not clear who received those documents or what the documents were about since the Attorney General’s Office redacted them extensively before providing them to the court.

. Coincidentally, claimant’s father in this case, who was then employed as an Assistant Attorney General, represented the State in Gilbert {supra) and argued for suppression of the ex parte statement.

. Indeed, the use of the phrase “matter under inquiry” by the Court of Appeals in Niesig should dispel any notion that a lawsuit must be filed before the ethical rule applies (see, Niesig v Team I, 76 NY2d 363, 374, supra; see also, Meachum v Outdoor World Corp., supra, at 362).